# HENRY S. JULIAN v. KANSAS CITY STAR COMPANY, Appellant.

### In Banc, January 27, 1908.

1. **JURISDICTION: Venue: Corporation:. Libel.** Under the statute (sec. 997, R. S. 1899) which says that "suits against corporations shall be commenced either in the county where the cause of action accrued, or in any county where such corporations shall have or usually keep an office or agent for the transaction of their usual and customary business," a citizen who resides in Jackson county may bring suit for libel in Platte county against a corporation which prints a newspaper in Jackson county that circulates in Platte county. The circuit court of Platte county has jurisdiction over the defendant corporation in such libel suit.

2. ———: ———: ———: ———: **Where Cause of Action Accrues.** The cause of action accrued in Platte county or in any other county in which the newspaper containing the libelous publication was circulated. Plaintiff, if he sued at all, was not compelled to bring his suit in the county where the newspaper was first uttered, nor in the county where it was printed and where the defendant corporation had its office and place of business, and where plaintiff resided. The plaintiff may choose his forum for bringing his suit among the counties of the State in which the newspaper containing the libel circulated, but having brought it in any one county all the damage done him by the libelous publication, wherever circulated, must be litigated in that suit.

3. ———: ———: ———: ———: **Inequality of Statutes: Constitutionality: Statutes Part of Charter.** Whether or not the statute which renders a corporation liable to be sued for a libel in a county in which neither plaintiff nor defendant resides does or does not afford a corporation protection of the law equal to that afforded an individual publisher of a newspaper,

who can be sued only in the county where defendant lives or where plaintiff lives and defendant may be found, is a question which the defendant corporation is not entitled to raise, nor will the statute be held to be class legislation discriminatory against corporations, since the corporation, in accepting its charter, accepted it with the terms the State imposed, one of which was that suits against it shall be brought in the county where the cause of action accrued. Those terms or statutory provisions are as much a part of its charter as they would be if written into it. The same chapter, which in one section says corporations may "sue and be sued," in another section says where suits against it shall be brought.

4. ————: ————: ————: ————: Injury: Inequality of Law. Whether or not the libel of a newspaper published by an individual is exactly as injurious as the same libel in a newspaper published by a corporation, and therefore there is no reason why the suit against the corporation may be brought in a county where neither plaintiff nor defendant resides, whereas suit against the individual publisher can be brought only in the county where defendant resides or in which plaintiff resides and defendant may be found, is a question to be addressed to the General Assembly, and not to the courts. The courts have nothing to do with the policy of the law. But the fact that in one case there is a personal liability, and none in the other, suggests a sufficient reason for the inequality, if there is any.

5. ————: ————: Libel: Where it Accrues. The right of action for a libel contained in a newspaper accrues wherever the newspaper is publicly circulated by defendant.

6. LIBEL: Definition. In its most general and comprehensive sense, any false publication injurious to the reputation of another is a libel. It is everything false, written or printed, which reflects on the character of another, and is published without lawful justification or excuse, whatever the intention may be.

7. ————: ————: False: Justification. Since under the law the truth of the charge or words used may be shown in justification, the word "false" is a necessary element of the definition of libel.

8. CAUSE OF ACTION: Definition. Defendant's definition of the words "cause of action" as the existence of "every fact which is material to be proved to entitle the plaintiff to recover," is accepted, *arguendo*.

9. LIBEL: Publication: Printing.. It is the publication of a libel, not the printing of it, that gives the right of action.

10. ——: **Newspaper: One Cause of Action.** The one issue of the newspaper containing the libelous article, though it may have been of many thousand copies, distributed in many counties, gave but one cause of action in this State; but to reach that conclusion it is necessary to hold that there was but one publication.

11. ——: ——: ——: **Circulated in Different Counties.** If it should be held that the publication first occurred in the county where the paper was printed and circulated and therefore that the cause of action accrued there, it would be necessary to hold that the publication there was a distinct publication from that in other counties where the newspaper containing the libel circulated and that therefore there was more than one publication and more than one cause of action.

12. ——: ——: ——: ——: **Where First Read: Emanation From One Wrongful Act.** There is but one publication in all of the one issue of a newspaper containing the libel—but one utterance—though some of the papers did not reach their destination as soon as the others. Yet as they all emanated from the one act, they all constituted but one libel. Where the publisher gives out his paper to be circulated, not only in one, but in many counties, and it is circulated as he intended, he is deemed in law to have published it in all the counties, and the act is no less a publication in one county than in another. In such case the cause of action accrued in any of the counties in which the paper circulated.

13. ——: **Allowing Plaintiff to Select Forum: Unfair Advantage.** Whether or not an unfair advantage may result to plaintiff by allowing him to select the county in which he will bring his suit for libel against a corporation whose newspaper circulates in many counties, is a question that should be addressed to the Legislature. The courts must take the law as they find it, whatever they may think of it.

14. **JURISDICTION: Venue: Waiver: Application for Change of Venue.** Defendant by filing its application for a change of venue enters its general appearance and thereby waives the jurisdiction of the court over its person, and cannot thereafter insist that the suit has been brought in the wrong county.

15. **LIBEL: Evidence: Ambiguous Words: Circumstances: Condition of Public Mind.** If the words used in the publication charged to be libelous, are ambiguous, or if under the conditions and circumstances in which they are used they are susceptible of a double meaning, the question of whether they were used in one sense or another is a question for the jury; and testi-

mony showing the peculiar conditions and circumstances which are thought to give the peculiar meaning charged, is competent —for instance, where it is charged *innuendo* that defendant meant to charge by the words used that plaintiff had as a legislator accepted bribes, evidence tending to show that at the time of the publication the public mind was much occupied with rumors of corrupt influences affecting legislation, is competent. And it is also competent for witnesses to testify what they understood the words to mean, when it is doubtful in what sense the writer intended them.

16. ———: ———: ———: Witness's Understanding of Meaning. The publication stated that plaintiff "did well in a legislative way." *Held*, that testimony by witnesses who read the newspaper article that they understood the words used to mean that plaintiff had while a member of the Legislature accepted bribes, was competent. Testimony as to the meaning of words or as to what witnesses understood them to mean is of a dangerous character, because it is difficult to contradict, but it is not for that reason incompetent; it is of the same character as opinion evidence, and should be weighed with the same caution. Its worth depends on the character and quality of the witness.

17. ———: ———: Words Innocent in Themselves: Witness's Understanding of Meaning. Where the words used in the publication charged to be libelous are innocent in themselves, but derive an offensive meaning because of certain conditions and circumstances in which they are used, the testimony of witnesses saying what meaning the words conveyed to their minds is competent; because, then it becomes a question of fact, to be determined by the jury, whether the words used did convey to the minds of readers a defamatory meaning, and proof of that fact may depend upon a showing of the conditions under which the words used might have had a sinister meaning.

18. ———: ———: ———: ———: "Did Well in a Legislative Way." Plaintiff Julian had been a member of the General Assembly, and was present at the State capitol at the time of a party caucus for the nomination of a candidate for the U. S. Senate, and the reporter for the defendant's newspaper telegraphed to its paper these words: "Julian is remembered here as a member of the Legislature, who did well in a legislative way, but also as Stone's chief of police, of whom a Democratic Senate committee said: 'He is not a proper man for the position.' A Democratic Senate removed him, and the commissioners who appointed him." *Held*, that it was for the jury to find whether the words "did well in a legislative way" were meant to be commendatory of his legislative course, or were

a veiled charge of bribery and corruption in office, and it was proper to permit witnesses to testify what they understood the words to mean.

19. ———: ———: ———: ———: **"But Also."** The word "also" following the word "but" gives significance to the clause of said publication which precedes that containing "also," and gives color to that clause.

20. ———: ———: **Justification: Removal From Office.** The sting of the article was that plaintiff had been removed from the office of chief of police by the State Senate and that the Senate evinced its condemnation of him to such an extent that the commissioners who appointed him were also removed. *Held,* that the charge was not sustained by evidence that the commissioners who appointed plaintiff had been appointed in vacation of the Senate, and that on the coming into office of another Governor another set of commissioners were appointed and these called for and obtained plaintiff's resignation, and hence the court did not err in instructing the jury that there was no evidence to sustain the defense of justification.

21. ———: ———: **Improper Induced by Defendant.** Where the defendant introduced evidence to show that plaintiff, while he was chief of police, did not enforce the laws or at least did not enforce them impartially, defendant cannot complain that the court permitted plaintiff to show by the police commissioners who succeeded those who appointed him that the same laws were not enforced under their administration because they were unable to do so.

22. ———: **Mitigation: Unfitness for Office.** The plaintiff's unfitness or lack of qualification for office was not in question in the libel suit in this case, and hence the court did not err in striking out that part of defendant's answer setting up in mitigation the fact that the plaintiff's unfitness for the office of chief of police was given wide publication in articles published in another newspaper about the time he was appointed and that these publications voiced the general opinion then prevailing.

23. ———: **Evidence: Remoteness.** The remoteness of an occurrence is a fact to be considered in estimating the weight to be given to evidence, but it does not render it incompetent.

24. ———: ———: ———: **Malice: Prior Threat.** It was competent, as affecting the question of malice, to permit plaintiff to testify that, in a conversation with the plaintiff twelve years before the alleged libel, the proprietor of defendant corporation had requested him to advocate a certain policy relating to municipal ownership of waterworks, and on his refusal to do so the

proprietor had said: "Young man, you will regret this—you will regret this and be sorry for it; a newspaper can make and unmake a man." Its remoteness did not affect its competency.

25. ———: ———: **Other Articles.** Plaintiff is entitled to offer in evidence other articles in the same newspaper which criticised his appointment to another public position, and which related to the same general subject, namely, his alleged unworthiness to hold an office of honor and responsibility, even though those articles may themselves have been the foundation of another libel suit.

26. ———: ———: **Justification: Hearsay: Unauthenticated Copy of Testimony.** To repel the influence of malice, or in justification of one of the editorials introduced in evidence by plaintiff to show malice, defendant offered in evidence what purported to be a transcript of the evidence before a Senate committee wherein a witness had undertaken to detail a conversation with the plaintiff which justified the editorial. *Held*, that the court, in the absence of any showing that the witness was not within reach of process, correctly sustained an objection to this evidence, since the unauthenticated purported copy of the witness's testimony was mere hearsay.

27. ———: ———: ———: ———: **Senate Journal.** The statute makes all authenticated copies of evidence printed in the journals of the Senate and House of Representatives competent evidence. But it does not make that competent which before was incompetent. If the original document printed in the journal was not itself competent, it is not made competent by being printed therein. Testimony taken before a legislative committee, which was not printed in the journal, is not competent evidence in a court of justice.

28. ———: **Pleading Innuendo: Counting on Words Themselves.** Where the petition counts on the publication as being a libel when interpreted to mean what it is charged to mean in the *innuendo*, plaintiff is entitled, by his instructions, to fall back on the words used as being themselves libelous without the *innuendo*, even though he has not added a second count to his petition so declaring.

29. ———: ———: ———: **Other Words.** In this case there were other words, besides those interpreted in the *innuendo* to be libelous, which of themselves come within the statutory definition of libel.

30. ———: **Province of Jury.** In deciding the ultimate question of libel or no libel, the jury have the authority to take, not only

their own estimate of the evidence, but their own opinion as to the law. And it is the duty of the court to tell them so.

31. ———: ———: Instructions: Misleading. It is the duty of the court to give the jury instructions as to the law in a libel suit, and if it gives them erroneous instructions whereby they are misled, it will be error for which the judgment will be reversed.

32. ———: ———: ———: ———: Verdict Nevertheless. If the court should instruct the jury that certain words constitute libel, and they should render a verdict of no libel the verdict would not be set aside. But if the court's instruction defining libel was incorrect and misleading, a verdict of libel or no libel would be set aside. But in this case the definition, being the statutory definition, was not incorrect.

Per GRAVES, J., dissenting, with whom LAMM, J., concurs.

1. JURISDICTION: Venue: Libel: Cause of Action: Corporation. The cause of action in a libel suit against a corporation publishing a newspaper accrues in the county where the paper containing the article alleged to be libelous was first given out to the reading public, whether that be the county in which it was printed, or some other county. And the suit can be brought only in the county where such paper was first given to the reading public. And that, in most cases, would mean the county in which the paper is printed and the corporation has its place of business.

2. ———: ———: ———: ———: Harmonious Construction. Such a construction of sec. 997, R. S. 1899, would be reasonable, and one that violates no constitutional mandate.

3. ———: ———: ———: ———: Choosing Forum: Legislative Intent. The General Assembly in enacting section 997, in 1855, had in mind railroad corporations, and did not intend, by requiring suits against corporations to be brought in the county "where the cause of action accrued," to mean that a libel suit accrued in every county where a newspaper published by a corporation circulated, nor to give the plaintiff the right to choose his forum among all such counties.

4. ———: ———: ———: ———: ———: Denial of Equal Protection of Laws: Unconstitutional. To hold that a plaintiff in a libel suit against a corporation publishing a newspaper containing the alleged libelous article may bring his suit in any of the counties in which the newspaper circulates and may choose for himself the county in which he will bring the suit, is to deny to such corporation equal protection of the laws, and the statute, when held to so mean, is, therefore, contrary to the Fourteenth

Amendment to the U. S. Constitution, and to section 10 of article 2 of the Missouri Constitution: *First,* because it makes a class not of corporations (which are citizens within the meaning of the amendment), but it is to make the law applicable to only those corporations which publish a newspaper; and, *second,* it gives to plaintiffs in libel suits against a corporation a privilege and right denied to plaintiffs in suits against individual publishers of newspapers and denied to individual plaintiffs against other corporations.

5. ———: ———: **Charter: Acceptance of Legislative Prescription.** Section 997, R. S. 1899, prescribing that suits against corporations shall be brought in the county "where the cause of action accrued," though found in the chapter on corporations, is properly a part of the Code of Civil Procedure. And no corporation, by accepting a charter from the State, contracts to accept matters of civil procedure.

6. ———: ———: ———: ———: **Unconstitutional Statute.** A corporation, in accepting its charter from the State, does not agree to be bound by the burden of an unconstitutional law, nor is it thereby estopped to deny that any section of the corporation laws is unconstitutional. Section 997, being violative of the Federal Constitution, in so far as it gives to a plaintiff in a libel suit against a corporation the right to choose the forum for bringing his suit from among all the counties in which its libelous publication circulates, cannot be said to be a part of a corporation's charter.

7. **LIBEL: Ambiguous Words: "Did Well in a Legislative Way."** The words, "Julian is remembered here as a member of the Legislature, who did well in a legislative way," are not ambiguous or double in meaning, nor words of censure, but clear and plain words of praise of Julian as a legislator, and the court should have so declared as a matter of law.

8. ———: ———: ———: **"But also."** Nor do the words "but also" lend significance or color to the preceding words "did well in a legislative way," but when properly understood the whole subject means that "Julian is remembered here as a member of the Legislature who did well in a legislative way, but (he is) also (remembered here) as Stone's Chief of Police."

9. ———: ———: ———: ———: **Witness's Understanding of Meaning: Jury's Construction.** The first words in the publication being unambiguous and clearly words of praise, and the remainder being equally unambiguous but clearly words of censure, the court should not have permitted witnesses who read them to testify how they understood them, nor submitted them to the jury for their construction.

10. ———: Witness's Understanding of Words Read: Slander. There should be a clearly marked line of distinction between libel and slander cases as to permitting witnesses to testify what they understood the words used to mean. There may be a reason for permitting witnesses in a slander suit to testify what they understood the words spoken to mean and imply. But in a libel suit, where the words are written or printed, it is error to permit a witness who read them to testify what he understood them to mean and charge.

11. ———: Circumstances. In a libel suit, nothing to give words a meaning other than their usual and ordinary meaning is competent evidence except the conditions, circumstances, and surroundings of the publication.

12. ———: Other Articles: Testimony Before Investigating Committee: Hearsay: Malice: Mitigation. Where plaintiff is permitted to introduce an article found in defendant's newspaper to show malice, defendant should be permitted to introduce the testimony of plaintiff and another witness taken before an investigating committee of the Senate, upon whose testimony the article was based. Such testimony is not hearsay, but even if hearsay it is competent in mitigation of damages.

13. ———: Instruction: Words Libelous on Face. The instruction read: "If the jury believe and find from the evidence that said words, taken all together and considered fairly with their context, and with other facts proven, were on their face libelous," etc. Held, contradictory and misleading. If the words were libelous on their face, then the jury had no right to consider "other facts proven."

14. ———: ———: Words not Actionable Per Se: Abandonment of Innuendo. The words "did well in a legislative way" are not libelous per se, and where plaintiff in his.innuendo charges that they meant and were intended to mean he had been guilty of bribery, he is not entitled to an instruction that the jury are to find for him if they find them to be libelous on their face, "even though they may not believe the words are reasonably susceptible of the construction placed upon them by the plaintiff in the innuendoes of his petition." Where the words are not libelous per se, plaintiff cannot abandon his innuendo, but is bound by the construction he has put upon the words.

15. JURISDICTION: Plea: Change of Venue: Waiver. Where defendant filed a plea to the jurisdiction and while it was pending his application for a change of venue, alleging the prejudice of the judge, it did not by filing that application en-

ter its general appearance and thereby waive its plea to the jurisdiction of the court over its person. It was as much entitled to a fair and unbiased judge to pass upon its plea to the jurisdiction as to one to pass upon any other question in the case. [Distinguishing Baisley v. Baisley, 113 Mo. 544.]

16. **LIBEL: Evidence: Shunned by Others.** Testimony by plaintiff that soon after the libel was published in the newspaper, his friends grew cold towards him, that when he went into a gathering of men they would quietly get up and go away, that when he went to his club its members avoided him, is incompetent, unless it is shown that such persons had read the libelous article or that their conduct was influenced by it.

Appeal from Ray Circuit Court.—*Hon. J. W. Alexander,* Judge.

AFFIRMED.

*Isaac N. Watson* and *Wash Adams* for appellant.

(1) The cause of action accrued in Jackson county where both parties resided and the alleged libel was first published. Barnard v. Boulware, 5 Mo. 454; Bankers Life Assn. v. Shelton, 84 Mo. App. 638; Tomans v. Smith, 153 N. Y. 214; Railroad v. O'Bryan, 112 Ga., 130; Ithaca Fire Dept. v. Beecher, 99 N. Y. 429; Bruill v. Ins. Co., 72 Wis. 430; Tupp v. Morin, 25 Abb. N. C. 399; Harvey v. Ins. Co., 37 W. Va. 281; Chevrier v. Robert, 6 Mont. 319; Anglo-Am. D. Co. v. Lombard, 132 Fed. 749. (2) All the copies of one newspaper containing a libel constitute one publication and *a fortiori* give rise to but one cause of action. 3 Sutherland on Damages, 648; Bigelow v. Sprague, 140 Mass. 427; Leonard v. Pope, 27 Mich. 149; Root v. Loundes, 6 Hill 518; Enos v. Enos, 135 N. Y. 611; Townshend on Slander & Libel (4 Ed.), p. 561; Newell on Slander & Libel (2 Ed.), 877; Lewis v. Daniels, 82 Mo. 577; Pennington v. Meeks, 46 Mo. 217. (3) A cause of action cannot be split up and asserted in several suits. Mateer v. Railroad, 105

Mo. 320; Wagoner v. Jacoby, 26 Mo. 532; Bank v.
Tracy, 141 Mo. 252. (4) A general appearance (e.
g., application for change of venue) entered after
a plea to the jurisdiction has been filed, does not waive
the plea. Meyer v. Ins. Co., 184 Mo. 481. This is
also true of the continuance made by order of the
court "by agreement of all parties." Higgins v.
Beckwith, 102 Mo. 456. The plea to the jurisdiction
was then pending and the court had ordered the case
continued to await the decision of the Supreme Court
in the prohibition case, and of the acceptance by coun-
sel for defendant of notice to take depositions. The
plea to the jurisdiction was then pending and the tak-
ing of the depositions was by the court prohibited.
Signing this stipulation was no waiver. Bentz v.
Eubanks, 32 Kan. 321; Smith v. Simpson, 80 Mo.
634. (5) It is only where the defendant pleads to
the merits in the first instance without questioning
the jurisdiction that objection is waived. Harkness
v. Hyde, 98 U. S. 476. (6) There can be no waiver,
because the question of jurisdiction here is one of sub-
ject-matter. The statute, section 997, is mandatory.
Wheelock v. Lee, 74 N. Y. 495; Davidburg v. Ins.
Co., 90 N. Y. 526; Haywood v. Johnson, 41 Mich. 598;
Bocken v. Railroad, 86 Mo. 492; Konold v. Railroad,
16 Utah 160; Graham v. Railroad, 64 N. C. 631; Mc-
Master v. Advance Thresher Co., 10 Wash. 147; Smith
v. Simpson, 80 Mo. 634. (7) In actions for libel wit-
nesses can not rightly be permitted to testify as to
the meaning they put upon the alleged libelous words.
Newell on Slander & Libel (2 Ed.), pp. 308-318; Cal-
lahan v. Ingram, 122 Mo. 355; Railroad v. McCurdy,
114 Pa. St. 554; Rangler v. Hummel, 37 Pa. St. (1
Wright) 133; Gribble v. Pioneer Press Co., 37 Minn.
277; White v. Sayward, 33 Me. 322; Republican Pub.
Co. v. Miner, 12 Colo. 85; Snell v. Snow, 54 Mass.
(13 Met.) 278; Pitts v. Pace, 7 Jones L. (52 N. C.)

558; Sasser v. Rouse, 13 Ired. (Law) 142; Townshend, Slander & Libel (4 Ed.), sec. 384, p. 639; Olmstead v. Miller, 1 Wend. 510; Weed v. Bibbins, 32 Barb. 315; Justice v. Kirlin, 17 Ind. 588; Dedway v. Powell, 4 Ky. 77; Gibson v. Williams, 4 Wend. 320; Van Vecten v. Hopkins, 5 Johns. 211; Maynard v. Beardsly, 7 Wend. 561; Wright v. Paige, 36 Barb. 438; Anderson v. Hart, 68 Ia. 400; Harrison v. Bevington, 8 Car. & P. 708; Jornigan v. Fleming, 43 Miss. 720; Beardsly v. Maynard, 4 Wend. 336; Kidd v. Fleek, 47 Wis. 443; McCue v. Ferguson, 73 Pa. St. 333; People v. McDowell, 71 Cal. 194; 3 Wigmore, Ev., pp. 2614-15; Hearne v. DeYoung, 119 Cal. 670; Quinn v. Ins. Co., 90 N. W. 349; Craig v. Buris, 55 A. 353; Stokes v. Morn. Jour. Asn., 73 N. Y. Supp. 245, 66 App. Div. 567; Hacker v. Heiney, 111 Wis. 313; Butler v. Barrett, 130 Fed. 944. (8) Whether the language is fairly susceptible of the *innuendo* applied to it, is a question for the court and not the jury to decide. Webb's Pollock on Torts, p. 314; Townshend on Slander & Libel (4 Ed.), p. 576; Lewis v. Daily News Co., 81 Md. 472; Christal v. Craig, 80 Mo. 373; Ukman v. Daily Record, 189 Mo. 378; Bundy v. Hart, 46 Mo. 464; Hudson v. Garner, 22 Mo. 426; Walker v. Trib. Co., 29 Fed. 827; Gompertz v. Levy, 1 Perr & Dav. 214; Railroad v. McCurdy, 114 Pa. St. 554; Jones v. Roberts, 73 Vt. 201 (50 A. 1071); Goldstein v. Frost, 6 B. & Cr. 154; Yrisarri v. Clement, 3 Bing. 432; Schurick v. Kollman, 50 Ind. 336; Kilgour v. Evening Star, 96 Md. 16; Hamilton v. Lowry, 71 N. E. 54; Parker v. Bennett, 74 N. Y. Supp. 214; Nonpariel Cork Co. v. Keasby, 108 Fed. 721; Dun v. Maier, 82 Fed. 169; Harrison v. Findley, 23 Ind. 265; Ratzel v. N. Y. News Pub. Co., 73 N. Y. Supp. 849; Williams v. McKee, 98 Tenn. 139; Robertson v. Edelstein, 104 Wis. 443; Hilder v. Brooklyn Eagle, 91 N. Y. Supp. 983; Van Vacter v. Walkup, 46 Cal. 134; Herrick v. Tribune Co., 108 Ill. App. 244;

Morrison v. Smith, 82 N. Y. Supp. 166, 83 App. Div. 206; Bradley v. Cramer, 59 Wis. 309; Cunningham v. Underwood, 116 Fed. 807; Richardson v. Thorpe, 63 A. 580. (9) The language, "Julian is remembered here as a member of the Legislature, who did well in a legislative way," is incapable of the *innuendo* ascribed to it, viz., that "plaintiff had earned the reputation of taking bribes," etc. The use of the adversative conjunction "but" demonstrates this. The lower court erred in submitting this incompetent *innuendo* to the jury and in refusing defendant's refused instruction 12, that the language is incapable of such *innuendo*. 1 Cent. Dict., 735, title "But;" Webster's Dict., title "But;" Hamilton v. Fautl, 95 N. W. 955; Railroad v. McCurdy, 114 Pa. St. 554; Hilder v. Brooklyn Eagle, 45 Misc. Rep. 165; Daily v. Eng. & Min. Journal, 88 N. Y. Supp. 6, 94 App. 314; Herringer v. Ingbery, 97 N. W. 460; Moss v. Harwood, 46 S. E. 385; Reporter's Assn. v. Sun Pr. & Pub. Co., 98 N. Y. Supp. 294; Rees v. N. Y. Herald, 98 N. Y. Supp. 548; State v. O'Hagan, 63 A. 95; Witham v. Atlanta Journal, 53 S. E. 105; State v. Conklin, 84 Pa. 482; Newell on Slander & Libel (2 Ed.), p. 620; Parker v. Bennett, 74 N. Y. Supp. 214, 68 App. Div. 148; Ratzel v. N. Y. News Pub. Co., 73 N. Y. Supp. 849, 67 App. Div. 598; Martin v. Press Co., 83 N. Y. Supp. 119; Jones v. Roberts, 73 Vt. 201, 50 A. 1071; Robertson v. Edelstein, 104 Wis. 443; Cole v. Neustadter, 22 Oregon 201; Pythian v. Paison, 92 S. W. 591. (10) The petition does not count upon the language as libelous *per se,* but avers specific *innuendoes* only. In such case the plaintiff is not entitled to a verdict upon the article as libelous, without the *innuendoes.* "Where plaintiff in libel wishes to fall back on the natural meaning of the words published, his complaint should set forth in one count the article with the *innuendoes* and in the other the article without the *in-*

*nuendoes.''* Hilder v. Brooklyn Eagle, 91 N. Y. Supp. 983, 45 Misc. Rep. 165; Herrick v. Tribune Co., 108 Ill. App. 244; Martin v. Press Pub. Co., 83 N. Y. Supp. 119 (40 Misc. 524); Wuest v. Brooklyn Citz., 76 N. Y. Supp. 706; Smid v. Bernard, 63 N. Y. Supp. 278; Westbrook v. N. Y. Sun Assn., 65 N. Y. Supp. 399; Brown v. Tribune Assn., 77 N. Y. Supp. 461, 74 App. Div. 359; Morrison v. Smith, 83 App. Div. 206; Leary v. Barnett, 65 Wis. 554; Quinn v. Ins. Co., 90 N. W. 349; Sillars v. Collier, 151 Mass. 50; Hamilton v. Lowery, 71 N. E. 54. (11) Evidence that plaintiff's friends avoided him, without proof of the occasion of such change of attitude, is inadmissible. Kersting v. White, 107 Mo. App. 265; Freedman v. Pullitzer Pub. Co., 102 Mo. App. 683. (12) The publications by defendant five years before criticising the appointment of plaintiff as Major of the 5th Missouri volunteers, were not admissible because they did not concern the same subject-matter as the article complained of in this action. Distin v. Rose, 69 N. Y. 124; Larrabee v. Minn. Trib. Co., 36 Minn. 141; Jacobs v. Cater, 87 Minn. 448; Kennedy v. Gifford, 19 Wend. 297; Howard v. Sexton, 4 N. Y. 157; Upton v. Hume, 24 Ore. 420; Schenck v. Schenck, 20 N. J. L. 208; Wigmore's Ev., p. 499, sec. 404; U. S. v. Brandell, 4 Cr. (C. C.) 683; Fredrickson v. Johnson, 60 Minn. 337; Bodwell v. Swan, 3 Pick. 376; Watson v. Moore, 2 Cush. 133, 63 L. R. A. 444; Cassidy v. Brooklyn Eagle, 138 N. Y. 242; Stuart v. Herald, 73 App. Div. 459; Keenholts v. Becker, 3 Denio 346; Root v. Lowndes, 6 Hill 518; Maynard v. Beardsly, 7 Wend. 560; Jacobs v. Carter, 87 Minn. 448; Townshend on Slander & Libel, sec. 392; Leonard v. Pope, 27 Mich. 145; Frazier v. McClosky, 60 N. Y. 337; Taylor v. Kneeland, 1 Doug. 67; Russy v. Farrell, 102 Tenn. 248; Comw. v. Harmon, 2 Gray 289; Stern v. Loewenthal, 77 Cal. 341; Westerfield v. Scrapps, 119 Cal. 607; Mix v. Woodward, 12 Conn. 262; Conant v. Leslie, 85 Me. 257; Gambrill v.

Schooley, 95 Md. 260; Russell v. Farrell, 102 Tenn. 248, 63 L. R. A. 444. (13) Where there is any evidence tending to support any defense pleaded, the jury should be permitted to pass upon it. It was therefore error to instruct the jury that the justification pleaded in defendant's answer has not been established by the evidence. Morse v. Maddox, 19 Mo. 451; Houghlating v. Ball, 19 Mo. 84; Emerson v. Sturgeon, 18 Mo. 170; Rippey v. Friede, 26 Mo. 523; Benton v. Klein, 42 Mo. 97; McFarland v. Bellows, 49 Mo. 311; Yates v. Brookanside, 27 Mo. 531; Husten v. Tyler, 140 Mo. 267; Huber v. Pulitzer Pub. Co., 153 Mo. 205. (14) The testimony of H. S. Julian and Frank M. Lowe, taken before the Senate committee, upon which the editorial in the Star, put in evidence by plaintiff, entitled, "Two Different Stories," was based, should have been admitted because it explains the motive and tends to disprove malice and tends to prove the truth of the editorial. Dalton v. Gill, 25 Hun 120; Reily v. Tinne, 53 Wis. 63; Young v. Gilbert, 93 Ill. 595; Foval v. Hallett, 10 Ill. App. (10 Brad.) 265; Henry v. Norwood, 4 Watts 347; Megley v. Farrow, 60 Md. 58; Burke v. Miller, 6 Blackf. 155; Wagner v. Holbrunner, 7 Gill 296; Perry v. Breed, 117 Mass. 155; Smith v. Gufford, 33 Ala. 168; Lewis v. Humphries, 64 Mo. App. 466. (15) The articles published in the Kansas City Times offered by defendant giving circulation to the statement of plaintiff's unfitness for the office, published at the time of his appointment, six years before the article complained of was written, were competent as showing the general repute of plaintiff's unfitness in mitigation. Hewitt v. Pioneer Press. Co., 23 Minn. 178; Carpenter v. N. Y. Ev. Journal, 89 N. Y. Supp. 263; Atwater v. Mom. News Co., 67 Conn. 504 (34 A. 865); Fowler v. Fowler, 71 Mo. 1084; Stuart v. Press Co., 67 N. J. (Law) 317. These articles were also admissible as tending to show

that the fact of the forced resignation of plaintiff was generally and widely known, before the alleged libel was published, and that readers having this knowledge understood when they read the words, "A Democratic Senate removed him and the commissioners who appointed him," that they meant he was forced out of the office as the result of the action of the Senate committee, and was not impeached by the Senate. (16) The conversation testified to by H. S. Julian and denied by Wm. R. Nelson, was incompetent and inadmissible. It occurred twelve years before the article complained of was published. There was no evidence tending to show that W. R. Nelson was then an officer of defendant corporation. The declarations of a stockholder are not binding on the corporation. There is no evidence that Wm. R. Nelson inspired, counseled or even knew of the publication complained of. Thompson, Cor., sec. 4875; Washington Gas Light Co. v. Lansden, 172 U. S. 544; Randall v. News Assn., 97 Mich. 142; Southern Express Co. v. Fitzner, 59 Miss. 581; Sommonsen v. Herald Co., 61 Wis. 628; McCabe v. Jones, 10 Daly (N. Y.) 222; Bradley v. Cramer, 66 Wis. 297; York v. Pease, 2 Gray 282; 18 Am. and Eng. Ency. of Law 1064; Perkins v. Railroad, 55 Mo. 214. (17) Anything tending to disprove malice is admissible in mitigation. The absence of malice may be shown by proving the defendant believed and had some reason for believing the charge to be true when made. This may be done either by showing defendant received information from others inducing belief of the charge, or by proving facts within defendant's knowledge calculated to induce such belief. The articles in the Times offered by defendant were therefore admissible in mitigation. Lewis v. Humphries, 64 Mo. App. 473; McClusky v. Pulitzer Co., 152 Mo. 339; Bush v. Prosser, 11 N. Y. 376; Harfield v. Losher, 81 N. Y. 249; Jones v. Townsend, 21 Fla. 439; Jones v. Murray, 167 Mo. 25; Weaver v. Hend-

rick, 30 Mo. 502; Callaghan v. Ingram, 122 Mo. 355. (18) It was error to strike from defendant's answer the newspaper publications in 1896-1897, averring plaintiff's unfitness for the office of chief of police and giving the reasons therefor. This evidence tended to show the absence of actual malice and was competent in mitigation of damages. Townshend on Slander & Libel (4 Ed.), p. 604; Hess v. Gansz, 90 Mo. App. 440; Lewis v. Humphries, 64 Mo. App. 473; Gray v. Brooklyn Un. Pub. Co., 35 App. Div. 286; Yeager v. Bunce, 93 S. W. 307; Atwater v. News Co., 34 A. 865; Hewitt v. Pioneer Co., 23 Minn. 178; Twitcher v. Jones, 17 N. Y. Supp. 491; Fowler v. Fowler, 71 N. W. 1084; Montgomery v. Knox, 23 Fla. 595. (19) Even if the words "did well in a legislative way" were ambiguous and fairly susceptible of the *innuendoes,* the opinions of witness as to their understanding of the meaning of the words would not have been admissible because no *colloquium* was pleaded in the petition. State v. Matheis, 44 Mo. App. 294; Dyer v. Morris, 4 Mo. 214; Underberger v. Scharff, 51 Mo. App. 111; Smith v. Gafford, 33 Ala. 172; Cosand v. Lee, 11 Ind. App. 511; Lewis v. Humphries, 64 Mo. App. 466; Easser v. Rouse, 13 Ired. (Law) 142; Wagner v. Saline Co., 45 Mo. App. 6; Carter v. Andrews, 33 Mass. 6; Smith v. Gafford, 33 Ala. 168.

*Judson & Green, F. W. Lehmann, A. C. Clover* and *Edward C. Crow, amici curiae.*

Apart from the other considerations which have been fully and thoroughly discussed in the brief of appellant's counsel, we submit that the construction contended for to support the jurisdiction is wholly inadmissible, for it is inconsistent with the history and purposes of the statute; it involves unjust and unreasonable purposes and discrimination on the part of the lawmakers, and would make the statute unconstitu-

tional both under the State and Federal Constitutions. It follows, therefore, that the court must give the statute a construction which would avoid these objectionable consequences. This is fundamental in statutory construction. (1) The occasion of the first enactment of this statute was doubtless the then first building of railroads in the State. It had not then been ruled, as it has since, that a railroad corporation is a resident of every county through which its line of road passes and wherein it has an agent, and that process can be served in any county where there is an office or place of business, although the chief officer or president may not reside therein. Dixon v. Railroad, 31 Mo. 409; Slavens v. Railroad, 51 Mo. 308; Crutsinger v. Railroad, 82 Mo. 64. It will be readily observed that in 1855, when railroads were first being constructed through the State, and it was assumed that parties injured would be compelled to go to St. Louis where the railroad companies had their chief offices, to bring actions for injuries suffered on the line of the road either to person or property, there was a real occasion for the enactment of a law which would relieve litigants of this burden and would enable them, at their option, to bring suits at points along the line of the road in counties where the cause of action accrued. (2) At the date of the first enactment of this statute there were no incorporated newspaper publishers in the State. It was not until 1864 that the incorporating of printing companies was authorized by the general corporation laws of the State. The words of the statute then could not possibly have been originally framed, in 1855, with reference to any such class of corporations. It is plain also that there is no class of corporations, other than incorporated newspaper publishers, where there can be "a" cause of action, as distinguished from "the" cause of action. In other words, as to all classes of corporations, except incorporated newspaper com-

panies, the words of the statute are applicable as they
are written, and there is no occasion for changing
"the" into "a" for the purpose of giving the plaintiff
the selection of the county wherein to bring suit. Un-
der the construction of section 997 adopted by the cir-
cuit court, the word "the" cause of action is construed
as if it read "a" cause of action. (3) It is a cardinal
rule in the interpretation and construction of all stat-
utes that courts will so construe them as to effectuate
the purpose which the Legislature intended to accom-
plish by their enactment, and courts of the various
States construing statutes relating to the venue of ac-
tions agree in stating that the purpose of such statu-
tory enactments is to insure the trial of cases in those
districts which will be most convenient to the parties
litigant and their witnesses. Finch's Heirs v. Edmond-
son, 9 Tex. 504; Merrill v. Show, 5 Minn. 148; Jordan
v. Garrison, 6 How. Prac. 6. The rule is universal that
where a statute is susceptible of two different construc-
tions, the courts will adopt that construction which
most fully harmonizes with and best promotes the pur-
pose for which the statute was enacted. Cole v. Skrain-
ka, 105 Mo. 303; Spitler v. Young, 63 Mo. 42; Ross v.
Railroad, 111 Mo. 18; State ex rel. Folk v. Talty, 166
Mo. 529. (4) Under the construction made by the
court below, plaintiffs in this class of actions, that is,
in suits for libels against newspaper publishers, which
are circulated through different counties of the State,
may select their own forum according to political or
other considerations. It is inconceivable that any Leg-
islature would pass a law involving such absurd and
unreasonable consequences, involving an admitted in-
equality in the "protection of the laws." The rule is
well settled that where there are two possible admissi-
ble constructions of a statute, the court will not adopt
that one which leads to absurd and unreasonable con-
sequences. In the present case, it is asked to read

"the" as "a" and to do so, as applicable to this class of actions, would involve absurd and unreasonable consequences, and the court cannot impute any such intent to the lawmakers. State ex rel. v. Rombauer, 104 Mo. 619; Kane v. Railroad, 112 Mo. 34; Bowers v. Smith, 111 Mo. 45; Chouteau v. Railroad, 122 Mo. 375. (5) *A fortiori,* such construction will not be given to the statute as to make it unconstitutional as to this class of actions. Of two admissible constructions, the court must not take that one which would make the statute unconstitutional. State ex rel. v. Industrial Home, 144 Mo. 275; Engling on Interpretation of Statutes, sec. 187; Milwaukee Industrial School v. Supervisors, 22 Am. St. Rep. 711; Hobbs v. McLean, 117 U. S. 567; Archibald v. Thomas, 3 Cowen 284; Lamar Water Co. v. City of Lamar, 128 Mo. 188, 140 Mo. 145; State ex rel. v. Railroad, 105 Mo. App. 207; Verdin v. St. Louis, 131 Mo. 26; Neenan v. Smith, 50 Mo. 525; Plum v. Kansas City, 101 Mo. 525. The statute as construed by the circuit court would be unconstitutional as arbitrarily discriminating between corporations and individuals. This discrimination, resting on no natural basis of classification, being purely arbitrary, would be violative of the Constitution of the State and of the United States. Thus, the Fourteenth Amendment to the Federal Constitution, in express terms, guarantees to every person within the State the "equal protection of the laws." Corporations are persons within the meaning of this provision. Santa Clara County v. Railroad, 118 U. S. 118; Railroad v. Ellis, 165 U. S. 150; Hammond Beef & P. Co. v. Best, 91 Me. 431; Luman v. Hitchings Bros. Co., 90 Md. 14, 46 L. R. A. 393. Due process of law under our Constitution has been held to prohibit class legislation and arbitrary classification. State v. Loomis, 115 Mo. 307; State ex rel. v. Ashbrook, 154 Mo. 375; Cooley on Constitutional Lim. (4 Ed.), p. 488; Russell v. Croy, 164 Mo. 97; State ex rel. v.

Railroad, 195 Mo. 228.   (6)   The statute construed to avoid the discrimination complained of is reasonable and constitutional.   Home Protection Co. v. Richards, 74 Ala. 468; 6 Thomp. on Corp., sec. 7431.   (7)   It is argued that corporations which have accepted charters from the State have consented and agreed to be bound by the provisions of the State statutes in force at the time of their incorporation, and hence that they cannot claim that any such statutes are unconstitutional.   This proposition is beside the question here and, we submit, does not meet our contention.   In this case, the question is not whether section 997 is constitutional, if given its natural and reasonable construction; but the question here is whether section 997 does not become unconstitutional when given a strained, unnatural and wholly new construction, and, therefore, whether the defendant corporation is estopped from asserting that this new and unreasonable interpretation of this old statute, now sought to be made or applied for the first time, renders it unconstitutional.   Prior to the decision in this case, this statute had never been construed as authorizing the filing of a suit against a corporation engaged in publishing a newspaper, in any other county than that in which it had its principal office and place of business.   By accepting the charter under the statute as it existed at the time it was organized, the defendant corporation could not know that such a construction would afterwards be given to it by the courts.   The principle that the obligation of a contract may be impaired in violation of the Constitution by a new or changed judicial interpretation of an old statute as well as by a new enactment or amendment is now well established.   Louisiana v. Pillsbury, 105 U. S. 278; Thompson v. Lee County, 70 U. S. 327; Butz v. City of Muscatine, 75 U. S. 575; Chicago v. Sheldon, 76 U. S. 50; Willoughby v. Holderness, 62 N. H. 227.

*Reed, Yates, Mastin & Howell, O. H. Dean, R. T. Railey* and *Thos. N. Lavelock* for respondent.

(1) Under section 997, Revised Statutes 1899, a suit against a domestic corporation may be brought in the county where the cause of action accrued. Mikel v. Railroad, 54 Mo. 145; Rippstein v. Railroad, 57 Mo. 86; Roberts v. Ins. Co., 26 Mo. App. 95. There is a marked difference made by our statutes as to the jurisdiction in suits brought against individuals and against corporations. Every one of the one hundred and fourteen counties of the State is open to a plaintiff if his cause of action accrued in any one of them. Under the common law, the action for libel was transitory, and might be brought in any jurisdiction where a completed cause of action existed, that is, wherever a single copy of the libel was published. Pinckney v. Collins, 1 Durnf. & East 571; Clessold v. Clessold, 1 Durnf. & East 647; Duke of Brunswick v. Harmer, 14 Q. B. 185; Freeman v. Norris, 3 Durnf. & East 306; Metcalf v. Markham, 3 Durnf. & East 652; Rex v. Bennett, 4 Barnwell & Ald. 311; Rex v. Carlisle, 1 Chitty 451; Comm. v. McCloon, 101 Mass. 6; Comm. v. Blanding, 3 Pick. 311; Newell on Libel (2 Ed.), p. 243. "Each copy of the libel sold is a distinct publication which perfects a cause of action." Odgers on Libel, 532, side page 384. These statutory words, "Where the cause of action accrued," can refer to no other cause of action than that made the basis of the suit, and only serve to effectuate the common law rule of jurisdiction in libel suits. Every separate publication gives a right of action and the right to choose the jurisdiction, but when chosen, all damages growing out of separate publications must be recovered for in the one suit, for the reason only that the policy of the law is against a multiplicity of suits. Tingley v. Times Mirror Company, 144 Cal. 205; Haskell v. Bailey, 25 U. S. App. 99; Bolo v. Wren, 63 Tex. 720; Bailey v. Chap-

man, 15 Tex. Civ. App. 99; Louisville Press Co. v. Tinnely, 105 Ky. 365; In re Kowalski, 73 Cal. 120; Street v. Johnson, 80 Wis. 455; Staub v. Van Benthuysen, 36 La. Ann. 466; State v. Kuntz, 12 Mo. App. 511. If there is any virtue in the place of the first publication, then Cole county, not Jackson, would be the place of jurisdiction, for the libel was telegraphed from there, which was a publication. (2) The application for change of venue waived the jurisdiction as to the person of defendant, if any existed theretofore. Baisley v. Baisley, 113 Mo. 551. This has always been the effect of an application for a change of venue in this State, where the sole matter involved is jurisdiction over the person of the defendant. Feedler v. Schroeder, 59 Mo. 364; Winningham v. Trueblood, 149 Mo. 586; Ivy v. Yancey, 129 Mo. 506. It has always been the law of this State that where a court has jurisdiction of the subject-matter of the action, an answer to the merits will give jurisdiction over the person. Peers v. Railroad, 59 Mo. 406; Posthlewait v. Ghiselin, 97 Mo. 424. Moreover, the plea to the jurisdiction filed in this case in the Platte Circuit Court was entirely out of place. The want of jurisdiction, if any existed, appeared on the face of plaintiff's petition. Defendant should, therefore, have demurred. Not having done so, the point could not be saved by the plea filed simultaneously with the application for a change of venue. It is expressly so held in Newcomb v. Railroad, 182 Mo. 707. See also: Bank v. Railroad, 119 Mo. App. 7; Bankers' Life v. Shelton, 84 Mo. App. 638; Spillane v. Railroad, 111 Mo. 561; State v. Sappington, 68 Mo. 457; 1 Chitty on Pleading, p. 661; 1 Stephens on Pleading, vol. 1, pp. 62-63. (3) Evidence as to the meaning of the words "did well in a legislative way," was admissible. This language is ambiguous. The context and manifest purpose of the entire article of which it is a part, as well as surrounding circumstances, show that it was

not intended to be used in a commendatory sense. Its intended meaning being a matter of doubt, proof in support of the meaning attributed to it by plaintiff's petition was proper. The whole libelous count contains an open charge and a veiled charge. The meaning of veiled language is always a proper subject of testimony in libel. Broome v. Gosden, 50 E. C. L. 728; Buford v. Young, 115 Ind. 175; Burton v. Holmes, 16 Iowa 254; Greenleaf on Evidence (15 Ed.), p. 408; Nelson v. Borchening, 52 Ill. 238; Smith v. Miles, 15 Vt. 249; Fokards-Starkie on Slander and Libel, sec. 45; Chamberlain v. Vance, 51 Cal. 83; Smart v. Blanchard, 42 N. H. 137; Wharton on Evidence, sec. 975; Dubost v. Berryford, 2 Campbell 511; Woolnoth v. Meadows, 5 East 463; Caruth v. Richeson, 96 Mo. 190; Lewis v. Humphrey, 64 Mo. App. 471; Wagner v. Saline County Progress, 45 Mo. App. 13; Knapp v. Fuller, 55 Vt. 314; Chiatovich v. Hauchett, 96 Fed. 686; Russell v. Kelley, 44 Cal. 644; The Howe Machine Co. v. Souder, 58 Ga. 67; Mix v. Woodward, 12 Conn. 262; Hess v. Fackler, 25 Iowa 9; Odgers on Libel and Slander, sec. 539; State v. Fitzgerald, 20 Mo. App. 411. The test of the admissibility of the testimony of witnesses as to their understanding of the words complained of has been held to be whether such words were of plain and obvious meaning or were ambiguous or equivocal. Green v. Miller, 33 Can. Sup. Ct. 193; Stirton v. Gummer, 31 Ont. 227; Israel v. Israel, 109 Mo. App. 382; St. James Mil. Ac. v. Gaiser, 125 Mo. 526; McGinnis v. Knapp & Co., 109 Mo. 141. (4) If "but" is used properly to mark the transition from one subject to another and to present contrasts (and this is one of its many uses) it may be suggested that "also" is properly used only to join clauses or sentences presenting ideas of the same general kind; that its synonyms are Likewise and Too. (See Webster's Unabridged Dictionary—Also.) Either through ignorance or ingenuity the writer joined these

two words which in significance are antitheses, and instead of serving to make plain the intention of the writer, as suggested by counsel for appellant, they only serve to confuse it. According to the literal significance of the words, the sentence might literally be rendered, "Julian is remembered here as a member of the Legislature, who did well in a legislative way, on the contrary—likewise, as Stone's Chief of Police, of whom a Democratic Senate Committee said, 'he is not a proper man for the position.' A Democratic Senate removed him and the commissioners who appointed him." (5) If the language counted on may be said to be susceptible of the defamatory construction placed upon it by the petition, even though it is also susceptible of an innocent construction, it is for the jury to determine whether the words are used in an innocent or a defamatory sense. Ukman v. Daily Record Co., 189 Mo. 394; McGinnis v. Knapp, 109 Mo. 150; Sanderson v. Caldwell, 45 N. Y. 398; Newell on Slander and Libel, p. 290, sec. 3, p. 291, sec. 5; McDonald v. Press Co., 55 Fed. 264; Morse v. Times Republican, 100 N. W. 870; Wesley v. Bennett, 5 Abb. Prac. 498; Patch v. Tribune, 38 Hun 368; Rundell v. Butler, 7 Barb. 260; Sanderson v. Caldwell, 45 N. Y. 398; Van Victor v. Walkup, 46 Cal. 124; Bergmann v. Jones, 94 N. Y. 64; Atkinson v. Detroit Free Press, 46 Mich. 374; Blakeman v. Blakeman, 31 Minn. 398; Thompson v. Pawning, 15 Nev. 212; State v. Spear, 13 R. I. 327; Dexter v. Tabor, 12 Johns. 239; Goodrich v. Walcott, 3 Cowan 240; State v. Smiley, 37 Ohio St. 30; Pfitzniger v. Dubs, 64 Fed. 697. Whatever may be the law in other jurisdictions, all of the authorities in this State, since the case of State v. Armstrong, 106 Mo., declare that under our constitutional provision the question of libel or no libel is one to be decided by the jury. Missouri Constitution, art. 2, sec. 14; State v. Armstrong, 106 Mo 395; Arnold v. Jewett, 125 Mo. 252; McCloskey v. Pul-

itzer Pub. Co., 152 Mo. 349; Duncan v. Williams, 107 Mo. App. 541. The statute defining libel sweeps down the rule, if it ever existed, which required a libel to charge a crime in order that it should be libelous *per se*. Any language that may fairly be said to result in the things denounced by the statute is libelous *per se*. Every libel is libelous *per se*. McGinnis v. Knapp, 109 Mo. 149; Ferguson v. Chronicle, 72 Mo. App. 465; Morse v. Times Republican, 100 N. W. 869, decided under Iowa statute exactly like ours; McDonald v. Press Co., 55 Fed. 264. Plaintiff's instruction defining libel (No. 1) is in the very words of the statute and is taken from McCloskey v. Pub. Co., 152 Mo. 345, where it is expressly approved. (6) May the libel be submitted to the jury both with and without the *innuendoes* of the petition? It is claimed that it was error to submit to the jury the alleged libel, both with and without the *innuendoes* of the petition. Counsel seem fond of citing foreign authority upon questions that are fully settled by our own decisions. Callahan v. Ingram, 122 Mo. 367; Russell v. Anthony, 21 Kan. 329; Sharp v. Larsen, 67 Minn. 431; Jarmen v. Rhea, 137 Cal. 343. An unnecessary *innuendo* may be rejected and verdict rendered upon the slander or libel as such *per se*. Hudson v. Garner, 22 Mo. 423; Michael v. Matheis, 77 Mo. App. 556. And in this State, the words are libelous *per se* if they are of such a character as to expose one to contempt, hatred, provoke to wrath, or deprive of the benefits of public confidence and social intercourse. Ferguson v. Chronicle Publishing Co., 72 Mo. App. 465; Price v. Whitely, 50 Mo. 441. No *innuendoes* are necessary where language is clearly libelous. Farley v. Evening Chronicle Pub. Co., 113 Mo. App. 216. Appellant's New York authorities are superseded by the later case of Lamberti v. Sun Pub. Co., 97 N. Y. 695, following opinion of LAUGHLIN, J., in Morrison v. Smith, 83

N. Y. App. Div. 310.   (7)  Were the articles concern-
ing the appointment of Julian as major of the Fifth
Missouri Volunteers Admissible?      Appellant com-
plains that these denunciatory newspaper articles were
not admissible in evidence "because they did not con-
cern the same subject-matter as the article complained
of in this action."    This is not the rule in Missouri.
Hall v. Jennings, 87 Mo. App. 633; Barrett v. Long,
3 H. L. C. 413; Odgers on Libel and Slander, p. 272;
Post Publishing Co. v. Hallum, 16 C. C. A. 643; Newell
on Slander and Libel (2 Ed.), 336.    The weight of au-
thority is against appellant's contention and in favor
of the Missouri rule.     13 Am. and Eng. Ency. Law
(2 Ed.), 1010, n. 2.    (8)  We contend, and the trial
court so held, that there is no evidence of justification
in this case.    The justification pleaded and proved, in
order to amount to legal justification, must be as broad
as the charge and must go to the precise charge.     Nel-
son v. Musgrave, 10 Mo. 648; Whittlesey's Practice,
p. 228; Odgers on Libel and Slander, sec. 170; Town-
shend on Libel and Slander, sec. 212; Newell on Libel
and Slander, p. 662; Starkie on Libel and Slander, p.
342; Self v. Gardner, 15 Mo. 480; Pratt v. Pioneer
Press Co., 30 Minn. 44; Fidler v. Delavan, 20 Wend.
57; Loveland v. Hossmer, 8 How. Pr. 215; Andrews
v. VanDuzen, 11 Johns. 38; Mull v. McKnight, 67 Ind.
535; Thompson v. Pioneer Press Co., 37 Minn. 285;
Woodruff v. Richardson, 20 Conn. 238; Sanford v.
Jaddis, 13 Ill. 329.    It was for the court to say as a
matter of law that the facts proven had no tendency
to show that a Democratic Senate Committee had said
"Julian is not a proper man for the position.    A
Democratic Senate removed him and the commissioners
who appointed him."    The substance and essence of
this charge is not that Julian is not a proper man for
the position, because he was a lawyer, etc., as appel-
lant contends, but that a Democratic Senate Com-

mittee solemnly adjudged that he was not a proper man and that this judgment was followed by a further solemn judgment of the Senate removing him from office and the commissionsrs who appointed him. Wallace v. Homestead, 117 Iowa 361.   The sting of the libel in this case is not that the Star said "Julian was not a proper man for Chief of Police," but that the Star purported to quote a solemn official report of a Senate Committee which said "He is not a proper man for the position," which report was approved by the full Senate by official action not only removing Julian, but also the commissioners who had the audacity to appoint him to office.   The plea of truth must extend to the entire language complained of and its meaning as an entirety.   Morse v. Times-Republican, 100 N. W. 872.   And must justify the same words stated in the declaration.   Commercial News Co. v. Beard, 106 Ill. App. 501; Skinner v. Grant, 12 Vt. 456; Kerr v. Force, 3 Cranch. C. C. 8.   (9)   Was the evidence of witnesses Julian and Lowe before the Senate investigating committee admissible as evidence in this case? Appellant's claim that the testimony of Julian and Lowe taken before the Senate Committee should have been admitted in evidence as tending to prove the truth of the editorial entitled "Two Different Stories" cannot be sustained.   The Senate report was admitted in evidence.   The evidence itself taken by the committee was hearsay and inadmissible as independent evidence in this case from any point of view.   Defendant might have shown an explanation of this article by facts in its possession and known to it at the time the article was published by way of disproving malice, which induced it to believe this false charge to be true, but it could not raise a collateral issue as to whether or not these things were actually true.   There was and could be no such issue in this case.   To try such a collateral issue would be to go entirely outside of the

pleadings and issues in this case.    (10)  It cannot be
said, as claimed by appellant, that the *innuendo* de-
scribed in plaintiff's petition to the words "A Demo-
cratic Senate removed him" was an impossible one.
Article 7, sections 1 and 2 of the Constitution of Mis-
souri provides that certain State officers may be im-
peached and removed from their office   for   certain
causes therein assigned.    To the mind of the average
reader of a newspaper, a charge that a State official
has been removed from office by the State Senate nec-
essarily implies that he had been proven guilty of
the things denounced by the Constitution.    Whether
or not a Chief of Police could be so removed is there-
fore a matter *dehors* the question.    The statement that
he had been so removed has in it as much power for
harm, and is as well calculated to bring one into dis-
grace and contempt as though the thing were possible.
"Circumstances substantially equivalent to a removal"
were not proven in this case.    Hudson v. Garner, 22
Mo. 423.    (11)  Appellant's claim that the threat of
Nelson testified to by Julian was incompetent and in-
admissible, cannot be sustained in the light of the Mis-
souri cases, as well as upon principle.    It will be seen
that Nelson was in fact the sole owner of the Star at
the time of the publication of this libel.    While the
suit is nominally against a corporation, yet the evi-
dence shows that he is the owner of all of the stock in
the corporation.    He, himself, is incorporated as The
Kansas City Star.    The rule invoked by appellant to
the effect that declarations of stockholders are   not
binding on the corporation fails in this case, because
the reason for the rule fails.    In Missouri "anything
that defendant has ever said or done with reference to
the plaintiff may be urged as evidence of   malice."
Hall v. Jennings, 87 Mo. App. 633; Peoples v. Detroit
Post, 54 Mich. 457; Post Publishing Co. v. Hallam, 16
C. C. A. 643; Barrett v. Long, 3 H. L. Cas. 413; Od-

gers on Libel and Slander, p. 272; Newell on Slander and Libel (2 Ed.), p. 336, sec. 41.

VALLIANT, J.—This is an appeal from a judgment against the defendant for $15,000, for an alleged libel.

I.  At the beginning the defendant challenges the jurisdiction of the court that rendered the judgment. The facts concerning that point appear on the face of the record and are as follows:  Plaintiff and defendant at the times herein mentioned were both residents of Jackson county; the defendant was a domestic corporation engaged in the business of publishing a newspaper; it had its office and place of business in Jackson county, and it was in that county that the newspaper containing the alleged libel was printed and issued to the public.  The newspaper circulated not only in Jackson county, but other counties in the State.  Defendant had no "office or agent for the transaction of its customary business" in Platte county, but the newspaper was circulated there as a public newspaper. This suit was instituted May 30, 1903, in the circuit court of Platte county; the summons was issued to the sheriff of Jackson county and executed by service on the defendant in Jackson county.  At the return of the writ the defendant appeared specially and filed a motion to dismiss the cause on the ground that it appeared on the face of the record the court had no jurisdiction to try it.

While that motion was pending the defendant filed a motion for a change of venue on the ground of undue influence over the mind of the judge.  The court sustained that motion, and made an order changing the venue to Ray county.  After the record was duly lodged in the Ray County Circuit Court, that court on October 12, 1903, of its own motion continued the cause, and on February 12, 1904, the cause was continued by con-

sent.   On May 25, 1904, the court overruled the de-
fendant's motion to dismiss for want of jurisdiction
and ordered that the cause be set for trial at the next
term, and granted leave to defendant to file an answer
within thirty days.   The defendant duly excepted to
the action of the court overruling the motion to dis-
miss and preserved its exception in a term bill of ex-
ceptions duly authenticated and filed.

September 9, 1904, defendant filed an answer to
the plaintiff's petition, and afterwards, October 10th,
an amended answer, in each of which was a plea to
the jurisdiction on the grounds above indicated, fol-
lowed by pleas to the merits.   As already stated, the
trial resulted in a judgment for the plaintiff and de-
fendant appealed.

There are two sections of our statutes discussed
in the brief of counsel on this branch of the case, sec-
tion 562, Revised Statutes 1899:   "Suits instituted by
summons shall, except as otherwise provided by law,
be brought:   "First, when the defendant is a resident
of the State, either in the county within which the de-
fendant resides, or in the county within which the plain-
tiff resides and the defendant may be found," etc., and
section 997:   "Suits against corporations shall be com-
menced either in the county where the cause of action
accrued, or in any county where such corporations
shall have or usually keep an office or agent for the
transaction of their usual and customary business."

The first of those two sections is in the Code of
Civil Procedure; the second is in the chapter on Cor-
porations, it first appeared in the revision of 1855, and
has continued in every revision since in the same
words.

The plaintiff's theory is that the cause of action
accrued in Platte county when the newspaper was there
put into circulation; defendant's theory is that the

cause of action (if any) accrued in Jackson county where the newspaper was first uttered.

Defendant has also a theory that section 997 which essays to render a corporation liable to be sued in a county in which neither plaintiff nor the defendant resides is unconstitutional, because it is class legislation and does not afford the defendant protection of the law equal to that afforded an individual. Defendant's position on this point is illustrated by counsel in one of their briefs filed by supposing the following:    Two newspapers are published in the same city, they both circulate through all the counties in the State; one of them is published by an individual the other by a corporation; they both publish the same libel on the same day; the plaintiff cannot sue the individual publisher elsewhere than in the county of his residence, or in the county where the plaintiff resides and the defendant may be found, but he may sue the corporation in either of the 114 counties in the State where, in his judgment, the greatest advantage is to be expected. From that supposed case the counsel argue that there is an inequality in the law that permits that discrimination and that the disadvantage to the corporation is quite material.    It is further argued that, although the corporation, when sued in a county in which it apprehends the popular sentiment is unfriendly, may take a change of venue, yet that at most only alleviates, does not remove, the inequality, does not put the corporation publisher on the same plane with the individual.

On the other side this argument is met with force by the plaintiff contending that the Legislature in dealing with the artificial creatures of the law may, in certain particulars, make them a class to themselves, and impose conditions upon them not imposed on individuals.

But in view of the statute law of this State as it was at the time the defendant organized as a corporation,

and as it still is, we may approach the question of the constitutionality of the section of the statute now assailed by the defendant with conceding for the sake of the argument that it does not place the corporation on an equal plane with the individual in reference to the county wherein it may be sued and that the inequality is a material disadvantage.   And it may also be conceded, for the sake of the argument, that a corporation whose charter puts it on a plane with an individual in a certain particular is entitled to the protection of the law in that particular equal to an individual under the same condition.

But in its origin there is a difference between a corporation and an individual.   The corporation is an artificial being, possessing only the rights that the State has granted and bearing the burdens that its charter imposes.

The State in issuing the charter may impose its own terms, and, when accepted, the corporation is bound by the terms; if terms are imposed in the charter that result in placing the corporation in a position less favorable than individuals would occupy in relation to the same subject, the corporation cannot complain because it is one of the conditions on which its right to be a corporation was granted.

The statute laws of the State   prescribing   the powers that a corporation to be organized under those laws may have, and prescribing also the terms and conditions under which the powers granted are to be exercised, are, in legal contemplation, incorporated in the charter of the corporation organized thereunder as absolutely as if copied into it.   If for example the State should see fit to say in its statute law that every corporation thereafter created should maintain an office at the seat of the State government in charge of an agent on whom process could be served, and should be liable to be sued in the county where the State

capital is located, the power of the State to enact such a law could not be questioned, and if a corporation should thereafter be organized and accept its charter under those terms it would have no right to complain.

The section of the statute which defendant now assails, section 997, Revised Statutes 1899, is a part of the chapter containing the statute law of this State concerning the organization of private corporations and prescribing their powers and duties. In one section of that chapter, section 971, defining the powers of corporations to be organized thereunder, it is said that they may "sue and be sued" by their corporate names, and this section, section 997, prescribes where they may be sued. The two sections go together; they are component parts of the same legislative act through which alone a corporation organized thereunder obtains its right to existence; they relate to the same subject; a corporation that accepts the one must accept the other also. This section, 997, was first enacted in 1855, it has been the law of this State, in that connection, continuously from that date to this, therefore it was the law under which the defendant corporation was organized and defendant cannot question its validity.

It is argued that there is no reason why any difference should be made in a case of this kind between a defendant corporation and a defendant individual, because the injury to the plaintiff is as great in the one as in the other. That is a question concerning the policy of the law with which courts have nothing to do, but if we were compelled to heed the argument, an answer might be found in the fact that in the one case there is a personal liability, in the other not so. If the corporation has a peculiar burden in one particular its stockholders have a peculiar advantage in another.

We hold, therefore, that the defendant in this case was liable to be sued in the county where the plain-

tiff's cause of action accrued although it may not be the county in which defendant resided or that in which the plaintiff resided and the defendant was found.

The next question is where did the cause of action accrue?

In the briefs on both sides references are made to authorities bearing more or less on this question; among all those authorities we have not seen one that holds contrary to the plaintiff's contention that the right of action for a libel contained in a newspaper accrues wherever the newspaper is publicly circulated by the defendant. Among the cases so holding are the following:

In California, under a clause of the constitution which provides that a corporation may be sued "in the county where the contract is made or where the obligation or liability arises," it has been held that a corporation residing and publishing a newspaper in Los Angeles, which newspaper circulated throughout the State, in San Diego county among others, was liable to be sued in San Diego county. The court said: "A corporation formed to publish a newspaper whose circulation is by the publisher extended into counties and places other than that of the principal place of business of the corporation, is in a position to commit an injury by a libelous publication precisely as is the electrical or water corporation or railroad company that extends its lines of operation beyond the boundaries of its residence or principal place of business in position to commit an injury in effecting its objects." [Tingley v. Times-Mirror Co., 144 Cal. 205.]

In a Kentucky case the publishers resided in Jefferson county and the newspaper was printed and issued from their place of business in that county, but it circulated in other counties, among which was Daviess county. The suit was brought in Daviess county. The Kentucky statute was: "Every other action for an

injury to the person of the plaintiff, and every action for an injury to the character of the plaintiff, against a defendant residing in this State, must be brought in the county in which the defendant resides, or in which the injury is done.'' The court said: ''It may be true that the cause of action accrued to the plaintiff in Jefferson county as soon as the Commercial was printed and placed in the mails in Jefferson county, but that fact does not necessarily preclude the plaintiff from maintaining his action in any county in which the injury to him was inflicted. . . . It seems clear to us that the action may be brought, at the option of the plaintiff, in the county of the defendant's residence, or in any county in which the injury to his character has been inflicted.'' [Louisville Press Co. v. Tennelly, 105 Ky. 365.]

In a Texas case the publishers resided in Galveston county, their newspaper, the Galveston Daily News, was printed and issued to the public in that county and circulated in other counties, among them Travis county; under a statute which provided that ''where the foundation of the suit is some crime, or offense, or trespass for which a civil action in damages may lie, in which case the suit may be brought in the county where such crime, or offense, or trespass was committed, or in the county where the defendant has his domicile,'' it was held that the suit was properly brought in Travis county. The court used this language: ''The fact that the crime of libel may have been completed by a publication of the paper in Galveston county does not make it any less a crime to circulate the number containing the alleged libelous article in other places. By the common law the sale of each copy is a distinct publication (Odgers on Lib. 532), and hence a distinct offense, and the prosecutor may at least choose for which of the distinct offenses he will call the guilty party to account.'' And again

the court said: "The offense having been committed in Travis county, and being indictable there, the present civil action for damages was properly brought in that county." [Belo & Co. v. Wren, 63 Tex. 686, l. c. 721.]

When we analyze the subject we find not much reason to dispute the proposition. What is libel? In Words and Phrases, vol. 5, p. 4116, it is defined thus: "In its most general and comprehensive sense any publication injurious to the reputation of another is a libel." In 2 Bouvier's L. D., p. 207, it is: "Everything, written or printed, which reflects on the character of another, and is published without lawful justification or excuse, is a libel, whatever the intention may have been."

Since under our law the truth of the article published may be shown in justification, to the above definition the word "false" in reference to the article should be added. When therefore the defendant sent its newspaper containing the article complained of into Platte county and there gave it out to the public, if the article was libelous in character what element was lacking to constitute a cause of action there and there? Let us take the definition of "cause of action" as given in the brief of defendant's learned counsel; it is the existence of "every fact which is material to be proved to entitle the plaintiff to recover." What fact essential to the plaintiff's right of recovery did not occur in Platte county? But it is said that the publication first occurred in Jackson county and that the plaintiff's right of action accrued there if at all. We agree with counsel for defendant that the one issue of the newspaper, though it may have been of many thousand copies distributed in many different counties, gave but one cause of action, but to reach that conclusion we must say that there was but one publication. If we should say that the publication in Jackson

county was a publication distinct from that. in Platte county, then we would have to say that there were more than one publication and more than one cause of action.   But there was but one publication—one utterance—and though some of the papers did not reach their destination as soon as others, yet they all emanated from the one act and all constituted but one libel, if libel at all.   It is the publication of the libel, not the printing of it, that gives the right of action. When the publisher gives out his paper to be circulated not only in one but in many counties and it is circulated as he intended, he is deemed in law to have published it in all the counties, and the act is no less a publication in one county than another.

If the defendant's newspaper was, in obedience to defendant's purpose, given public circulation in Platte county and if it contained a libel of the plaintiff, the plaintiff's cause of action accrued in that county.

We appreciate the force of the argument of defendant's counsel wherein it is pointed out that under certain conditions an unfair advantage may be obtained by allowing the plaintiff to select the county in which he may bring his suit, but that argument should be addressed to the Legislative Department of the State government.   The courts must take the law as they find it, whatever they may think of it.

Since we have reached the conclusion that the circuit court of Platte county had jurisdiction of the cause, the writer hereof, for himself, prefers to not express any opinion on the question of whether the defendant waived whatever objection if any it might have had to the jurisdiction.   But that question has received the consideration of the court, and the opinion of the court on it is set forth in the opinion by GANTT, C. J., in which a majority of the court concur.   That opinion is to be read with this as expressing the decision of the court on that question.

II.   We turn now to the case on its merits:

The petition states in effect as follows:    That the defendant is a domestic corporation having its domicile in Jackson county and engaged in publishing a newspaper called the Kansas City Star, which has a large circulation in Jackson and Platte counties and elsewhere throughout this State and Kansas and other states; that plaintiff is also a resident  of  Jackson county engaged in practicing law for a living and until the wrong done him by defendant, was esteemed among his neighbors and all good people, to whom he was in any wise known, to be a person of good name and credit; that in 1890 and again in 1894 he was elected a member of the General Assembly and served as such in the 36th and 38th sessions of that body and in 1896 he was appointed, qualified and served as Chief of Police of Kansas City; that the defendant, designing maliciously to injure plaintiff in his good name and reputation and bring him into public scandal, etc., etc., and cause it to be suspected and believed that he was guilty of taking bribes and using his office as a member of the General Assembly to corruptly make money, and that he was unfit to hold a public office and had been so found after a thorough investigation by a Senate Committee and had been impeached and removed from office by the Missouri State Senate, and to injure the plaintiff, did on the 5th day of January, 1903, at Kansas City, falsely, wickedly and maliciously compose, print and publish in its newspaper, the "Kansas City Star," in and through Jackson and Platte counties and through the State of Missouri, Kansas and the United States generally, of and concerning the plaintiff the following false scandalous, malicious, defamatory and libelous article, to-wit:

"Stone himself failed to appear last night and this morning. His interests were in the hands of Kimbrough Stone, his son, and Henry S. Julian. Julian

is remembered here as a member of the Legislature, who [meaning the plaintiff] did well in a legislative way, but also as Stone's chief of police, of whom a Democratic senate committee said: 'He [meaning the plaintiff] is not a proper man for the position.' A Democrat senate removed him [meaning the plaintiff] and the commissioners who appointed him [meaning the plaintiff].''

Then the petition goes on to state *innuendo* in effect that thereby the defendant intended to mean, and the readers of the paper would understand it to mean, that the plaintiff had acquired a reputation while a member of the General Assembly of taking bribes and was willing to use his official influence corruptly to make money; that the Governor of the State had had him appointed Chief of Police of Kansas City, but that the Missouri State Senate, knowing plaintiff, his character and reputation, in pursuance to impeachment proceedings, had removed and ousted him from office on account of his being found guilty of high crimes and misdemeanors in office or of misconduct or habits of drunkenness or oppression in office, and had adjudged him disqualified to ever hold an office of honor or trust, etc., etc., and intended to mean and the readers of the paper would understand it to mean that the plaintiff was known to be so corrupt and venal that the commissioners who appointed him Chief of Police were themselves removed from office for having appointed him, all of which was untrue and the defendant knew it was false, but made the publication maliciously to injure the plaintiff. The prayer of the petition was for actual damages and punitive damages.

The defendant in its answer admitted the publication, denied the *innuendo*, and set up certain facts as in justification and also in mitigation.

The verdict of the jury was for the plaintiff, assessing his compensatory damages at $10,000, and

presume damages at $5,000; judgment for $15,000, and defendant appealed.

III.   There was evidence tending to show that at the time this publication was made the public mind was a good deal occupied with rumors of corrupt influences affecting legislation, called in the slang of the day "boodling." Over the objection of defendant the plaintiff was permitted to introduce evidence of witnesses who testified that they read the article in defendant's newspaper which forms the basis of this suit and that they understool the term "did well in a legislative way" to mean that the plaintiff had been corruptly influenced in his official acts as a member of the General Assembly, taking bribes--boodling. This is assigned for error.

On the question of the admissibility of evidence of that kind the authorities are not entirely uniform. They all agree to this extent, viz: If the words are ambiguous, or if under the conditions and circumstances in which they were used they are susceptible of a double meaning, the question of whether they were used in one sense or the other is a question for the jury. And the authorities also agree that testimony showing the particular conditions and circumstances which are thought to give the peculiar meaning, is competent, but whether or not, after those conditions and circumstances are shown, a witness should be allowed to testify as to what he understood the words to mean when he heard or read them there is some difference of opinion.

If we say that conditions and circumstances may influence the meaning of the words and that it is a question of fact whether the particular words complained of conveyed the meaning it is charged they conveyed, we do not see why the testimony of a witness as to the meaning that the words actually conveyed to his mind is not competent. It is perhaps testimony

of a dangerous character because it is difficult to contradict, but it is of the same character as opinion evidence and should be weighed with the same caution; its worth depends on the character and quality of the witness.

Defendant in its brief quotes from Newell on Slander & Libel (2 Ed.), p. 308: "In actions for defamation witnesses cannot be allowed to testify as to the meaning which they understood the alleged defamatory matter to convey or the particular person to whom they understood it to apply." But in a section immediately following, the same author says, page 311: "There is some conflict of opinion in regard to the doctrine laid down in the text, and it would seem that the law is not to be regarded as completely settled upon this question." Then the author goes on to quote authorities holding contrary to his text, among them the Supreme Court of Illinois, Nelson v. Borchenius, 52 Ill. 236, wherein it is said: "It may well be asked what better guide there is, in that inquiry, than to ascertain how they were really understood by the by-standers." And the text-writer refers also to Smart v. Blanchard, 42 N. H. 146, wherein he says all the authorities are reviewed and the conclusion is reached that the testimony is admissible.

Starkie on Slander & Libel (5 Ed.), p. 466: "Where the words spoken or the meaning of the terms employed are ambiguous, and it is doubtful in what sense the speaker intended them, the question is in what sense the *hearers* understood them; and if, when words may have two meanings, the hearers understood them in an actionable sense the action is maintainable; for the slander and damage consist in the apprehension of the hearers."

The author is there speaking of words that may have two meanings, one actionable, the other not so, and whether the one meaning or the other is to

be ascribed to them is to be determined by ascertaining which meaning they actually convey to the minds of the hearers, the only direct proof of which would be the testimony of hearers themselves. The author goes on to say that if it be intended to ascribe to the words some peculiar meaning imparted to them by previous occurrences, conversations or other matters, a witness cannot be asked, "What did you understand by the words?" until the foundation is laid by introducing evidence of the existence of such matters.

Odgers on Libel & Slander (4 Ed.), p. 633: "But if with their ordinary meaning the words are perfectly good sense as they stand, facts must be given in evidence to show that they may have conveyed a special meaning on this particular occasion. After that has been done, a by-stander may be asked, 'What did you understand by the expression used?' " And on page 634 the author says: "The plaintiff may give evidence of surrounding circumstances from which a defamatory meaning can be inferred; he may call witnesses to state how they understood the libel; though the jury are not bound to adopt the opinions of such witnesses." [See also, Goldsborough v. Orem & Johnson, 103 Md. 671.]

The precise question of whether or not it is in such case permissible to ask a witness who read the alleged libel what meaning it conveyed to his mind has not been decided by this court. In Callahan v. Ingram, 122 Mo. 355, it was held that the trial court did not err in refusing to allow a witness to testify as to what he understood the alleged slanderous words to mean, but that was not an adjudication of this question because in that case there was no ambiguity about the words complained of; the defendant had said of the plaintiff that he was a "downright thief." But in the cases that have come before it this court has held that when the words are ambiguous or sus-

ceptible of more than one meaning, the question of the sense in which they were used is one of fact for the jury. In Caruth v. Richeson, 96 Mo. 186, l. c. 190, the court said: "When the language is ambiguous, and it is doubtful in what sense the publisher intended it, the question is in what sense the hearers understood it, for slander and damage consists in the apprehension of the hearers."

If the question is, in what sense did the hearers understand it, what better source of information have we than the hearers themselves?

In McGinnis v. Knapp & Co., 109 Mo. l. c. 141; St. James Military Academy v. Gaiser, 125 Mo. l. c. 526; and Ukman v. Daily Record Company, 189 Mo. l. c. 394, the law is declared that when the meaning of the words complained of is doubtful the question is for the jury, and the meaning is to be gathered from the context and all the facts and circumstances under which they were used.

In Wagner v. Printing Co., 45 Mo. App. 6, l. c. 13, the court, per ELLISON, J., said: "We may concede (for the present purposes) that, where the words are plain and unambiguous and disconnected from outside matter which would give them a different or additional meaning, such evidence should not be heard. But where matter is alleged, and it is shown, as in this case, that something has occurred in consequence of which the words would convey a meaning additional to that which would ordinarily attach to them, such testimony should be heard. [Townshend on Slander, sec. 384; Odgers, Libel & Slander, 538.] And, where the language may or may not impute the crime which is charged to have been imputed, such testimony is proper. [Townshend on Slander, sec. 140; 2 Greenleaf on Ev., sec. 417; Nelson v. Borchenius, 52 Ill. 236; Knapp v. Fuller, 55 Vt. 311.] The fact as to

what was intended must be ultimately determined by the jury.''

And in Lewis v. Humphries, 64 Mo. App. 466, l. c. 471, the same court, per SMITH, P. J., said: ''The rule to be deduced from the authorities to be presently cited, including those of our own State, is that, in an action where the words are not obviously slanderous, in order to entitle plaintiff to recover, *first*, he must allege and prove that the words were actually used in an actionable sense and were applied to plaintiff; *second*, that the hearers so understood them, and upon this latter point the testimony of the hearers as to how they understood them is admissible.''

It will be noticed that the authorities above quoted consider the subject of the interpretation of the alleged defamatory words under three heads: first, words that are not ambiguous or doubtful in their meaning; second, words, on their face, susceptible of more than one meaning; third, words innocent in themselves, but which derive an offensive meaning because of certain conditions or circumstances under which they were uttered. In the first, there is no question for the jury (at least in the sense of its being a question of fact); in the second, it is a question of fact without the proof of any outside conditions; in the third, it becomes a question of fact when proof is adduced showing conditions under which the words used might have a sinister meaning. In the second and third clauses, the question of fact is given to the jury, because the words are liable to convey to the minds of the hearers or readers a defamatory meaning, but before the jury can find for the plaintiff they must be satisfied, not only that the words were liable to convey the injurious meaning, but in fact did convey that meaning. Now, what is the best proof of the fact as to the meaning actually conveyed? The testimony of witnesses saying what they understood the words to mean is in the cate-

gory of opinion evidence, the jury are not bound by it, even though they credit the witness with honesty, because they may think his judgment was in error. On this point the court at the request of the defendant gave this instruction:

"5. The jury are instructed that they are not bound by any construction placed by any witness upon any of the language of the article sued on and offered in evidence; and the jury themselves are the sole judges of the meaning to be ascribed to the language."

But we can see no reason why either party in a suit of this kind, on a question of this kind, may not call to the witness stand intelligent and reputable members of the community to whom the words were addressed, and ask them what meaning the words conveyed to their minds when they read them. We are not meaning to say that a defendant, using words not fairly susceptible of being construed as defamatory, is to be held liable because he happens to use them in the presence of ignorant or prejudiced or corrupt witnesses who may testify that they so understood them. If the words are not susceptible of such a construction, either in themselves or in the light of circumstances proven, the court should not submit the question to the jury.

IV. In which one of the three classes above named did the words "did well in a legislative way" fall? It is contended on the part of defendant that they fall in the first class, they are too plain for construction, they have only a complimentary reference to the plaintiff as a legislator.

Language is a wonderful moral power; one may become so skillful in the use of it that he may purposely instill in the minds of his hearers or readers thoughts which are so far beneath the surface that they are scarcely traceable back to him as the author. A meaning may be veiled with a veil designed to be penetrated and the meaning rendered all the more

forceful by requiring some mental effort to uncover it.

When we are reviewing the past conduct of a man and say of him that at a certain time he was engaged in a certain business and did well in it, the idea conveyed is that he was prosperous from a business point of view. The term "did well" is easier of understanding and more appropriate when applied to the result of one's operation in a commercial business than his conduct in an official capacity. The pecuniary pay of a member of the General Assembly is fixed by law at a sum scarcely more than to defray his expenses while serving the State, his real compensation is in the honor he receives as a member of the lawmaking department of the State government. If the purpose of this article had been to commend the plaintiff for his official conduct a term more appropriate could have been used without going to a dictionary of commercial phrases. The man who wrote the article was a witness in the case, and one reading his evidence is impressed, not only with the fact that he is a man of more than ordinary intelligence, but also that he is a master in the use of the English language. If his intention was to express praise of the plaintiff's official conduct, the term used was not up to the standard of expression to be expected of one of his intelligence and skill.

An argument is made on the use of the disjunctive conjunction "but" interposed between the term that defendant insists is laudatory and that which is not so. "Julian is remembered here as a member of the Legislature who did well in a legislative way, but also as Stone's chief of police of whom a Democratic Senate Committee said," etc. The interpretation the learned counsel for defendant would put on the whole sentence is that it means to say that whilst Julian was remembered there as one who performed his duties well as

a member of the Legislature, yet on the other hand he was also remembered "as Stone's chief of police of whom," etc., etc. The word "also" following the word "but" gives significance to the syntax; it suggests an ellipsis in the sentence to be supplied by implication. When the term "but also" connects two parts of a sentence it usually implies that what follows it is in addition to what precedes it; it carries the idea "not only that, but also this." Conceding therefore that the ellipsis might be filled with words to give the sentence the meaning which defendant puts upon it, it may with equal fairness be filled with words to express this idea, to-wit, Julian is remembered here not only as member of the Legislature who did well in a legislative way, but also as Stone's chief of police of whom, etc.; and in that connection the disjunction becomes a conjunction and the words "did well in a legislative way" take color from the words which follow.

We think the sentence in itself was sufficiently double in its meaning to justify the trial judge in submitting it to the jury for interpretation, and we also think that there was sufficient evidence of a condition of suspicion in the public mind in reference to the conduct of members of the Legislature to render those words liable to convey to the minds of the people reading them that the plaintiff had made dishonest use of his office for his private gain.

We hold that the court committed no error in submitting the question of the meaning of the article to the jury, nor in receiving the testimony of witnesses as to their understanding of the article when they read it.

V. Instruction numbered 11 given for the plaintiff was as follows:

"The court instructs the jury that the justification pleaded in defendant's answer has not been established, by the evidence." That is assigned as error.

The instruction would have been in better form if it had said that there was no evidence of justification. There was evidence tending to show that the plaintiff by lack of training and experience was not qualified to fill the office of chief of police, and there was also evidence tending to show that after a committee of the State Senate had investigated the police department of Kansas City and made its report, the police commissioners who had appointed the plaintiff Chief of Police were not confirmed by the Senate, that other commissioners were appointed who were confirmed and who signified to Mr. Julian that they preferred that he would resign, and he did so. The commissioners whose appointment failed of confirmation by the Senate had been appointed by the then Governor in the vacation of the Senate, and when the question of their confirmation came on to be heard the term of the Governor who had made the appointments had expired, and another Governor was in office who preferred to make his own selection of police commissioners, and the result was that the appointments of the former Governor were not confirmed, but new appointments were made and confirmed. There was no evidence of removal of the former commissioners by the Senate or of the plaintiff as Chief of Police.

The sting in the article complained of was not that Julian by lack of training and experience was not qualified to fill the office or that the commissioners who appointed him were not confirmed, but it was that he had been removed from office by the Senate and that the Senate evinced its condemnation of him to such a degree that the commissioners who appointed him were also removed from office. There was no evidence of justification of that charge; the court did not err in giving that instruction.

VI. It is complained that the court permitted the plaintiff to prove by the police commissioners who suc-

ceeded those who appointed him that certain laws were not enforced under their administration because they were unable to do so. If there was anything wrong in admitting that evidence it was induced by the defendant who had introduced evidence to show that the plaintiff while he was Chief of Police did not enforce the same laws or at least did not enforce them impartially. Defendant has no right to complain of that evidence.

VII. It is insisted that the court erred in striking out that part of defendant's answer setting up in mitigation the fact that the plaintiff's unfitness for the office of Chief of Police was given wide publicity by articles published in another newspaper in 1896. and 1897 and that these publications voiced the general opinion then prevailing. What has been above said in regard to the plea of justification applies to this plea also. The plaintiff's unfitness or lack of qualification for the office was not in question.

VIII. Over the objection of defendant, plaintiff introduced evidence of a conversation in 1891 between the plaintiff and the proprietor of the newspaper, that is, the owner of practically all of the stock of the defendant corporation. In that conversation, according to the plaintiff's testimony, he had been requested by Mr. Nelson to advocate a certain policy relating to municipal ownership of waterworks, and on the plaintiff's refusal to do so Mr. Nelson said: "Young man you will regret this—you will regret this and be sorry for it; a newspaper can make and unmake a man." Mr. Nelson as a witness for defendant testified that there was never any such conversation between the plaintiff and himself.

It is insisted that this testimony should not have been received because, in the first place, it was too remote, and, secondly, there was no evidence that Mr. Nelson was at that time the controlling power directing the policy of the newspaper. The remoteness of

209 Sup.—4

the alleged occurrence is a fact to be considered in estimating the weight to be given the evidence, but it does not render it incompetent. It was competent on the question of malice.

As to the proprietorship of Mr. Nelson, even if the other evidence that had been introduced before the evidence relating to this conversation had not sufficiently shown it, the subsequent testimony of Mr. Nelson himself put that fact beyond question.

IX. Plaintiff was permitted to introduce in evidence other articles which had previously appeared in the same newspaper which criticised adversely his appointment to the rank of Major in the 5th Regiment Missouri Volunteers in the Spanish-American War. It is contended that these articles related to a different subject than the one contained in the alleged libel sued on, and constituted what might have been the foundation for another suit, therefore it was error to put them in evidence in this case.

The propriety of this evidence is debatable. On the part of the defendant it may be said it injects into the case what is practically a new charge of libel; to meet which the defendant has had no notice, no opportunity to explain or justify. Of course when the testimony is admitted the defendant would have the right to deny, explain or justify the publication, but the seeming injustice is in springing a new issue for which the defendant has had no opportunity to prepare. On the other hand, the evidence is of a character to show the hostile state of defendant's mind in regard to the plaintiff, which is of the very essence of the libel. Whilst the authorities are not all one way on this question yet the preponderance is in favor of admitting the evidence. In 18 Am. and Eng. Ency. Law (2 Ed.), 1010, it is said: "It has been frequently held that in an action or prosecution for libel or slander, publications or statements of the defendant concerning the

plaintiff other than the one which is made the basis of the action, may be given in evidence for the purpose of showing or of aggravating malice, whether or not such words can become the basis·of a recovery in a separate action. In many cases, however, the operation of this rule has been restricted to the uttering or publication of similar words or words of a similar import, or declarations upon the same subject, or referring to the publication complained of, and evidence of a distinct and different calumny has been held inadmissible.'' In notes to the text is a collection of cases illustrating the doctrine.

In Odgers on Libel & Slander (4 Ed.), p. 326, it is said: ''Malice may be proved by extrinsic evidence. showing that the defendant bore a long standing grudge against the plaintiff. . . . The plaintiff has to show what was in the defendant's mind at the time of the publication, and of that no doubt the defendant's acts and words on that occasion are the best evidence. But if plaintiff can prove that at any other time, before or after, defendant had any ill-feeling against him, that is some evidence that the ill-feeling existed also at the date of the publication; therefore, all defendant's acts and deeds that point to the existence of such ill-feeling at any date are evidence admissible for what they are worth. . . . Thus any other words written or spoken by the defendant of the plaintiff, either before or after those sued on or even after the commencement of the action, are admissible to show the animus of the defendant, and for this purpose it makes no difference whether the words tendered in evidence be themselves actionable or not, or whether they be addressed to the same party as the words sued on or to some one else. . . . Such words need not be connected with or refer to the libel or slander sued on; provided they in any way tend to show malice in defendant's mind at the time of the publication.'' The

author then adds that if the other words are actionable the court should instruct the jury that they must not give damages for them.   The court in this case gave the jury such instruction.

In Newell on S. & L. (2 Ed.), p. 334, the law is thus stated:  "Evidence of former or subsequent defamation is only admissible to determine the motive with which the words sued on were published.   They are only admissible when malice in fact is in issue. . . .   It is now well settled that whenever the intention of the defendant is equivocal, that is, whenever the question of malice or good faith is properly a' out to be su' mitted to the jury, evidence of any previous or su' e ment libel is admissible, even though it be barred by the Statute of Limitations, and even though a former action has been brought for the libel now terdered in evidence and damages recovered therefor."

Those quotations are from text-writers of recognized authority in the profession and we think they fairly state the law on this subject.   Even under the limitation of the rule suggested in the brief for defendant and sustained by respectable authority, that the other publications should relate to the same subject as that sued on, we cannot say that these articles were not admissible, because they all relate to the same general subject, to-wit, the alleged unworthiness of the plaintiff to hold an office of honor and responsibility. We hold that the court did not err in admitting that evidence.

X.   In justification of one of the editorials introduced in evidence by the plaintiff to show malice, entitled, "Two Different Stories," or to repel the inference of malice, the defendant offered in evidence what purported to be a transcript of the evidence before a Senate committee wherein a witness had undertaken to detail a conversation with the plaintiff which tended

to justify the publication, and wherein also the plaintiff as a witness denied the conversation as detailed. The court sustained the plaintiff's objection to this evidence and that ruling is assigned as error. The court's ruling in that respect was correct. The unauthenicated purported copy of the testimony was mere hearsay. To justify a defamatory article or to repel the inference of malice one has no right to say that A, B and C told me so and I believed it. If there were any facts within the defendant's knowledge at the time the publication was made that would go to show that defendant in making the publication acted in good faith and therefore without malice believing the statements to be true, he would have the right to repel the inference of malice by showing those facts, but to allow him to resort to hearsay evidence would be a dangerous element to introduce into the trial of a case of this kind.

In ruling that this rejected evidence was hearsay we are not overlooking section 3091, Revised Statutes 1899: "The printed journal of the Senate and House of Representatives of this State, and all public documents or reports therein contained, and all reports or documents printed by order of this State, or by either house of the General Assembly, or purporting to be printed by the authority thereof, shall be prima-facie evidence to the same extent that duly authenticated copies of the originals would be." The statute does not make that competent evidence which before was incompetent; it only places the documents printed in the Senate or House journal on an equality with otherwise duly authenticated copies of the originals; if the original document is not competent, neither a duly certified copy, nor the copy printed in the journal is competent. In this case the report of the committee was published in the Senate journal (Laws 1897, p. 511), and it was offered and read in evidence by the

defendant without objection, but the evidence taken before the Senate committee was not published in the journal or anywhere by authority. Whether even the report was competent evidence we need not discuss, because it was introduced by defendant and read without objection, but testimony taken before a legislative committee, where for the general public information a broad range of investigation is indulged, where relevancy and competency are not always as strictly observed as in a judicial trial, has not been declared to be competent evidence for use in a court of justice by any statute. For aught that appears in this record the witnesses whose testimony before the committee the defendant offered to read were within the reach of the process of the court and could have been produced at the trial.

XI. In connection with the article criticising the plaintiff's appointment as Major of the 5th Regiment of Missouri Volunteers, the plaintiff while on the stand as a witness was asked whether while he was with the regiment it was inspected by any army officer, to which question defendant interposed a general objection, the court asked counsel for plaintiff to state the purpose of his question, to which counsel replied: "Bearing on his qualification and his standing as an officer, both of which are impeached by this article." The Court: "That would be hearsay evidence." Mr. Yates: "I am just asking who inspected it." The Court: "Well let him answer." Defendant excepted. The witness then stated who inspected the regiment and there the matter ended. The testimony was irrelevant but it was immaterial and could have had no serious effect.

XII. The first instruction given for the plaintiff was in these words: "1. The court instructs the jury that the petition of the plaintiff in this case charged, and the answer of the defendant admits, that the defendant published of and concerning the plain-

tiff the following language: 'Stone himself failed to appear last night, and this morning his interests were in the hands of Kimbrough Stone, his son, and Henry S. Julian. Julian is remembered here as a member of the Legislature who did well in a legislative way, but also as Stone's chief of police, of whom a Democratic Senate committee said 'he is not a proper man for the position, a Democratic Senate removed him and the commissioners who appointed him;' and the court instructs the jury that our statute defines a libel to be the malicious defamation of a person made public by any printing or writing tending to provoke him to wrath, or expose him to public hatred, contempt or ridicule; or to deprive him of the benefits of public confidence and social intercourse, and if, therefore, believe and find from the evidence that the article admitted to have been published by the defendant of and concerning the plaintiff had a tendency to provoke him to wrath, or to expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, then the article in question is libelous under the statute.''

Instruction number 5 was as follows: ''It is admitted that the defendant published of and concerning the plaintiff the words sued on. If, therefore, the jury believe and find from the evidence that said words, taken all together and considered fairly with their context, and with other facts' proven, were on their face libelous, as elsewhere defined in these instructions, then the jury will find for the plaintiff, even though they may not believe the words sued on are reasonably susceptible of the construction placed upon them by the plaintiff in the *innuendoes* of his petition.''

Defendant contends that instruction 5 was erroneous because the petition counts on the publication as being a libel when interpreted to mean what it is

charged to mean in the innuendo, and that to entitle the plaintiff to fall back on the words themselves as libelous per se without the innuendo he should have added a second count so declaring.

In Callahan v. Ingram, 122 Mo. 355, the words complained of were "downright thief" applied by defendant to plaintiff, and the innuendo was that the words mean to charge plaintiff with corrupt conduct in his office as superintendent of streets; there was but one count in the petition. The only instruction directing a verdict for the plaintiff in that case was to the effect that if the jury should believe from the evidence that the words "downright thief" as applied to the plaintiff were false the verdict should be for the plaintiff. It was there contended by the defendant that the instruction was erroneous because it was an abandonment of the meaning plaintiff put on the words in his petition, but the court did not sustain that contention; in the opinion by MACFARLANE, J., it said: "It will be seen that the office of the innuendo is to set a meaning upon words or language which are of doubtful or ambiguous import and taken alone are not actionable, and it follows that in case the defamatory meaning is apparent from the words used, an innuendo is unnecessary." But when the words are actionable in themselves, the court said: "In such case the defendant can put in issue the truth of the words spoken, either with or without the alleged meaning. 'It will then be for the jury to say from the proofs whether the plaintiff's innuendo is sustained. If not, the plaintiff may fall back upon the words themselves, and urge that, taken in their natural and obvious signification, they are actionable in themselves without the alleged meaning, and that, therefore, his unproved innuendo may be rejected as surplusage.' " [Citing authorities.] We see no reason to question that rule. In this case the words complained of, without the clause "did well in

a legislative way'' or even giving that clause the inter-
pretation that defendant would have us give it, come
within the statutory definition of libel, section 2259,
Revised Statutes 1899, because it says of the plaintiff
that he has been adjudged by a committee of the Sen-
ate to be not a proper man for the office with which he
had been entrusted and that he was by the Senate
removed from that office and even those who appointed
him were removed, thus ''tending to provoke him to
wrath or expose him to public hatred, contempt or rid-
icule, or to deprive him of the benefits of public con-
fidence and social intercourse.''

The study of this instruction brings into consid-
eration a very peculiar and a very important feature
of the law of libel, that is, that the jury are the judges
of the law as well as the fact. In deciding the ultimate
question of libel or no libel the jury have the author-
ity to take not only their own estimate of the evidence
but their own opinion as to the law. And since the
jury have that right it is the duty of the court to
tell them so. It is the duty of the court to give the jury
instructions as to the law and if it should give them
erroneous instructions whereby the jury is misled, it
would be error for which a judgment would be reversed
as in other cases. But if the court should instruct the
jury that certain words constituted a libel, yet the jury
should render a verdict of no libel, they would be exer-
cising the authority which the Constitution expressly
gives them, and the verdict could not on appeal be
set aside merely on the ground that it was contrary
to the court's instruction. The court in the instruction
we are now considering did not tell the jury that these
words, independent of the *innuendo,* were libelous, but
told them in effect that they had the right to form
their own opinion on that question, bearing in mind
the definition of libel given in other instructions, and
that if they thought that those words independent of

the *innuendo* were libelous they should find for the plaintiff. If the definition of libel referred to was not correct, then the instruction would be misleading and it would be error. But the definition was correct. Therefore, with a correct definition of libel before them and the words complained of before them and the circumstances under which they were used being in evidence before them, why did not the jury have the authority to say whether it was a libel or no libel? What does the Constitution mean if it does not mean that the jury have that authority? And if they have, how could it be error for the court to tell them so? The defendant itself asked two instructions on this point which the court gave, which in effect told the jury that though the court might instruct as it pleased, yet they were not bound by the instructions, that they alone had the right to say whether the words constituted a libel or not, and if they thought the words were not libelous they should find for the defendant.

The plaintiff's instruction is but the converse of the defendant's two instructions and tells the jury that if they come to the conclusion that the words were libelous they should find for the plaintiff. The defendant's two instructions are as follows:

2. "The court instructs the jury that in a case of this kind the court can give such instructions as it deems proper, but the jury are not only the sole judges of the weight to be given to the testimony, but under the Constitution and laws of Missouri, the jury are themselves the sole judges of the law of libel and as to whether the alleged publication was libelous, and, if the jury find that the language complained of in this action was not libelous, then the jury should find for the defendant."

6. "The jury are instructed that upon the question of libel or no libel the jury in respect thereof are the judges of both the law and the fact, and, so far as this

question is concerned, they are not bound by the instructions of the court; and if the jury find and believe from the evidence that the article received in evidence and claimed by the plaintiff to be a libel is not a libel, then the verdict should be for the defendant.''

XIII. In defendant's assignment of errors there are 102 errors assigned. We have considered each one of them, but we have in this opinion discussed only those that the learned counsel for defendant seem to consider as most serious. We do not feel justified in carrying this opinion to greater length, and will therefore say that we find nothing in any of the other points that would justify a reversal of the judgment.

The printed record contains nearly 700 pages of extra large size and of brevier type; we have gone with care through it all. The cause was tried with eminent ability by court and counsel on both sides, and although it has given us great labor to review, yet the labor has been lightened by the briefs of the learned counsel.

The judgment is affirmed. *Gantt, C. J., Burgess, Fox* and *Woodson, JJ.,* concur; *Lamm* and *Graves, JJ.,* dissent.

## SEPARATE CONCURRING OPINION.

GANTT, C. J.—We concur in Judge Valliant's opinion but desire to add that in our opinion defendant waived the jurisdiction as to its person. That the Platte Circuit Court had jurisdiction of libel causes is of course conceded. One of the pivotal questions discussed by our brethren who have formulated the majority and the minority views of the court is, did the circuit court of Platte county lawfully acquire jurisdiction over the person of the defendant? We agree with Judge Valliant that the cause of action originated in Platte county when the newspaper containing the libel was circulated in that county and under section 997 the

plaintiff had the right to commence his suit in that county and that said section is constitutional. But we are also of opinion that when the defendant filed its application for a change of venue, it entered its general appearance in the cause and even though the process might not have been sufficient to give jurisdiction over the person of defendant up to that point in the case, by making this application it waived the jurisdiction of the Platte court over its person and could not afterwards avail itself of its objection to the jurisdiction over its person. [Feedler v. Schroeder, 59 Mo. 364; Baisley v. Baisley, 113 Mo. l. c. 551; Rodney v. Gibbs, 184 Mo. l. c. 18.]

In Feedler v. Schroeder, 59 Mo. 364, the service of process was insufficient, but the defendant asked and obtained a change of venue and in the court to which the cause was sent moved to quash the return of the officer, but this court said: "Though the defendant may not have been in court by service of the process, his application for a change of venue was an appearance in the cause. His motion came too late." In Baisley v. Baisley, 113 Mo. l. c. 551, this court again said: "But, aside from anything contained in the foregoing observations, all right to question the jurisdiction of the Chariton Circuit Court ceased when the defendant applied for a change of venue. This was such an appearance as waived proper service of process and admitted the jurisdiction of the court over the person of the defendant. [Feedler v. Schroeder, 59 Mo. 364.] And that court certainly had jurisdiction over the subject-matter of the action, to-wit, over that class of cases." And these cases were followed with approval in Rodney v. Gibbs, 184 Mo. l. c. 18. These cases have been followed on this point by the Courts of Appeal on various occasions. [In re Ada Jones, 90 Mo. App. l. c 322; Carter v. Wamack & Stagge, 64 Mo. App. 338; Montgomery v. Ins. Co., 80 Mo. App. 500.] The fore-

going cases are in harmony with the law in similar cases. Thus, in Farrell's Admr. v. Brennan's Admrx., 25 Mo. l. c. 94, it was held that where upon the death of a party plaintiff, his administrator is made a party as his representative without the appearance of the defendant or notice to him, the irregularity will be cured by the appearance of the defendant and the granting of a continuance on his motion, Judge SCOTT saying, "This surely healed the error." To the same effect is Ferris' Admr. v. Hunt, 20 Mo. 464; Crawford v. Railroad, 171 Mo. l. c. 77 and 78. That a party can not confer jurisdiction over the subject-matter of an action by voluntarily entering his appearance to such an action is the settled law of this State, but not so as to his person. He may waive the venue, or the irregularity of the process, or process altogether, if the court has jurisdiction of the class of cases under the law. It is the generally accepted doctrine that what is denominated a general appearance has this effect. What is a general appearance has been determined from time to time by the courts. As already seen, it has been repeatedly held by this court and the Court of Appeals that applying for and obtaining a change of venue is such a general appearance as will waive a special objection to the jurisdiction of the court. Such is the doctrine in our sister states. [Vanderbilt v. Johnson, 4 Ill. 48.] In Freeman v. Burks, 16 Neb. 328, the defendant challenged the jurisdiction of the court, and then applied for a change of venue to hear the motion. Judge MAXWELL, speaking for the Supreme Court, said the motion was not sufficiently specific, but added: "But if the motion had been sufficiently specific, still the plaintiff herein by filing the affidavit for a change of venue had entered a general appearance in the action and could not afterwards object to the jurisdiction." This ruling is in harmony with our own decisions in regard to waivers by pleading over. If a party files a

demurrer and it is overruled and he pleads over by answer the demurrer is waived. Without further elaboration we hold that, in addition to what is said in Judge VALLIANT's opinion as to the jurisdiction of the Platte Circuit Court, said court had jurisdiction over the defendant by reason of its entering its general appearance by applying for and obtaining a change of venue to the Ray Circuit Court, and it could not thereafter object to the jurisdiction of said court over its person.

With these modifications we concur in Judge VALLIANT's opinion. *Burgess, Fox* and *Woodson, JJ.*, concur in these views.

## DISSENTING OPINION.

GRAVES, J.—The essential facts of this case are stated in the opinion by VALLIANT, J., and a repetition thereof would be at the expense of brevity, in an opinion which of necessity must be argumentative and somewhat long. We are unable to concur with our learned brother in the very scholarly and able opinion by him filed.

The newspaper, whether great or small, published by corporation or individual, which maliciously libels a citizen, whether in public or private life, should answer in adequate damages for the wrong done. On the other hand, there should not be such judicial expressions as would tend to bridle the public press in speaking and publishing the truth. We are satisfied with the wisdom and foresight of our venerable forefathers as expressed in the first amendment to the Federal Constitution. Congress and the States cannot enact laws having a tendency to muzzle a free press, nor should they be written by the courts. By that amendment our citizens were allowed to speak above muffled whispers, and the censorial muzzle was taken from the mouth of the press.

209 Sup—7

Again, we should recollect that a libeler is a libeler, whether individual or corporate, and if the one should be followed, or dragged, as in this case, to the uttermost ends of the State to receive the admeasured punishment in the way of a verdict for damages, so should the other. There should be no distinction between malicious libelers. What by the law is meted out to one, should by the same token be meted out to the other, and this at the hands of the courts. What rights have the individuals, who maliciously publish a libel, over an association of individuals, masquerading under a corporate name?

Nor in writing the law can we consider the greatness of the paper or the party publishing it, whether individual or corporation. In nearly every well-developed county of the State will be found a group of good men who, desiring to teach the political faith which was born with them and still remains with them, banding themselves and their limited means together, and organizing a little corporation to publish a newspaper in order to spread and promulgate that faith which lies within them. The task may be accomplished, but ofttimes at a financial sacrifice. For these we write the law, as well as for the great metropolitan daily. What applies to the one, must in the very nature of things apply to the other. Legislatures are presumed to take cognizance of existing publicly known conditions when they pass laws, and courts must take cognizance of such in trying to interpret the laws thus passed. We must not blind our eyes, in the construction and interpretation of statutes, to the fact that there is a firmly fixed doctrine of equal protection of the law. With these general remarks, let us proceed to a discussion of the points of difference.

I. It is broadly contended that under section 997 a plaintiff in this one class of cases has the right to select the forum of his trial and locate it in either of the

114 counties of the State, provided copies of the paper reach all of them. That he can leave the county of his residence, which is likewise the residence of the defendant, and where the first publication is made, and pick from the 114 counties one where the citizenship is such that, to his mind, indicates practical results in his suit. If such plaintiff be a Democrat and is suing a paper of the Republican faith, he claims the right under this statute to go into a Democratic county where, perhaps, the paper, on account of political views, is in bad odor, and there have a trial of the issue. If plaintiff be a Republican, and is suing a Democratic paper, under this contention he claims the right to lodge his complaint in the strongest Republican county of the State, where perhaps that paper, for political reasons, is in bad odor, and there, with those surroundings, have the measure of his damages bountifully meted out to him. So also if he be a brewer, and has been, in his judgment, defamed by some paper advocating the cause of temperance, or religion, he would claim the right to go to the "wettest" county of the State, and there surrounded by his friends and sympathizers, have justice meted out to him, and all in the name of the law. *Vice versa,* as to the forum and surroundings, were the plaintiff a believer in the cause of prohibition and the offender an organ published in the interest of the liquor business. And all this in the name of the law, which detests everything unreasonable, unjust and unfair! And all this where no other class of suitors can claim such right, and in the name of equal protection and equal rights under the law. The maimed and crippled and the widows and orphans of those who have been killed, by the negligent acts of corporations, have, in suing the negligent corporation, no such broad privilege of selecting their forum. They cannot pick a county thoroughly unionized, where they may have the influence of organized labor in the trial of their cause. This cherished

right of picking a forum is left solely to the individuals who have been damaged by the publication of a libel. Does the act of the Legislature embodied in said section 997 mean these things? Did the Legislature mean to say that in that class of cases where the plaintiffs are claimants of damages for alleged libels, and the defendants are domestic corporations, then the plaintiff shall have the unrestricted right to choose his own forum for the trial of his cause? If the statute means that, then the opinion of my learned brother is correct; if it does not, then the opinion has written it into the statute. How many thinking lawyers, yea, how many members of this court, believe for a moment, that when this act, now sec. 997, was passed in 1855, the original bill had read, "Suits against corporation shall be commenced either in the county where the cause of action accrued, or in any county where the corporation shall have or usually keep an officer or agent for the transaction of their business, except where the plaintiff claims damages for libel, in which case such plaintiff shall have the unrestricted right to select his own forum, notwithstanding a previous cause of action has accrued to him for the publication of the same libel in some particular county," that such bill would have passed? The Legislature of Missouri never intended such a law and in our humble judgment will never pass such a law. This Act of 1855 was passed at a time when railroads were being extended throughout the State, passing through county after county. The Legislature had such corporations in mind, and as applied to them it is reasonable, for they have an agent on the ground, and as we have held, are in a sense a citizen of the county. So to insurance company cases, doing business in the different counties by authorized agents. [Slavens v. Railroad, 51 Mo. 308; Crutsinger v. Railroad, 82 Mo. 64; Meyer v. Ins.

Co., 184 Mo. l. c. 487.]   The jurisdiction is sustained on the ground of residence or citizenship.

Statutes must be given a reasonable construction, if such can be given them, and further, must be so construed, if possible, as to make them violate no constitutional inhibition.   [Lewis's Sutherland on Statutory Construction sec. 516; State ex rel. v. Railroad, 105 Mo. App. l. c. 213; Sedalia ex rel. v. Smith, 206 Mo. l. c. 363; Swift v. Topeka, 43 Kan. 671, and cases therein cited.]

We can give to this statute a reasonable construction and one which violates no constitutional mandates. Every letter of the statute can be enforced, by saying, under the admitted facts of this case, the cause of action accrued in Jackson county, where it stands admitted that the paper containing the article alleged to be libelous was first given out to the reading public, and thereby first published.   Or if the first publication be in some other county, let the action be brought there.   Had we not better read into this statute words would be consonant with a reasonable construction, than read into it, as first above indicated, words which make it abhorrent to reason, right, justice and fair-play?

Whilst the law broadly stated says that each publication constitutes a cause of action, yet the courts hold, as was admitted in the argument of the case and in respondent's brief, that but one suit can be brought on the same libelous publication, no matter in how many places, or at how many times it is published, i. e., given to the reading public.

The extent of the publication may be shown to enhance the damages, and the suit thereby draws to itself all alleged causes of action, and makes of them all *the* cause of action mentioned by the statute.   The courts have made this rule of law, because to permit a great multiplicity of suits for the one libelous article would be to shock the sense of justice and right.

Then why not, in the interest of a construction of

this statute, which would comport with justice and right, say that *the* cause of action mentioned therein, in cases of libel, means the cause of action accruing by the first publication of the article? We believe that we should so construe this statute, and for that reason this suit should have been brought in Jackson county and not elsewhere. For fifty-two years this statute has been upon the books. The reports are full of libel suits. Lawyers of State renown have represented plaintiffs in these suits. No discovery that their clients possessed the unlimited right to select the forum—a valuable asset, indeed, to be hid away so long. It has remained for distinguished counsel in this case, in the role of a modern Columbus, to make this discovery, in a case possessing modern exigencies. The construction placed upon the statute by learned lawyers prior to these modern exigencies ought to be of weight with the court in now construing the statute.

II. But if we are in error about the construction which should be given to section 997, and the counsel for plaintiff and my learned brother VALLIANT are right, in their construction, to the effect that this statute gives to a plaintiff suing a corporate defendant for libel the unrestricted right to select the forum for the trial of his case—we say his case, because he can have but the one suit on the one libelous article—then such a construction and such statute violates the Fourteenth Amendment to the Federal Constitution, in that it is a denial of the equal protection of the laws.

A corporation is a citizen within the meaning of this amendment. Covington and Lexington Turnpike Road Co. v. Sandford, 164 U. S. 1. c. 592, where the court said: "It is now settled that corporations are persons within the meaning of the constitutional provisions forbidding the deprivation of property without due process of law, as well as a denial of the equal protection of the laws. [Santa Clara County v. Railroad, 118 U. S.

394; Pembina Mining Co. v. Pennsylvania, 125 U. S. 181, 189; Railroad v. Beckwith, 129 U. S. 26; Railroad v. Gibbes, 142 U. S. 386, 391.]''

If we admit, as we must, that laws may not be violative of constitutional inhibitions where they apply to all of a class, because each and every member of the class has the same rights and is subjected to the same inconveniences and penalties, yet that does not affect this case.   The class here is not corporations, but the class is *libelers or publishers of libels*, which publisher may be an individual or a corporation.   Suppose the Legislature should enact a law reading thus: ''Suits against publishers of libels shall be brought as follows: If such publisher of a libel be an individual, then the suit shall be brought in the county where such individual resides or in the county where the plaintiff resides and the defendant may be found; but, if such publisher of a libel be a corporation, then plaintiff shall have the unrestricted right to bring his suit in any county of the State, wherein the said publisher has circulated and published the paper or written instrument containing such libelous article.''   Would such a law stand under the Fourteenth Amendment?   If a corporation is a person, within the meaning of the Constitution, as the courts have said, how can it stand under this guaranty of equal protection of the law?   Now, when we read sections 562 and 997 together, and give the latter the construction placed upon it by our distinguished brother and consider that the class we are dealing with is *''Publishers of Libels,''* we have this supposed statute *verbatim et literatim*.   Under this supposed statute, which is the law declared in the opinion by Judge VALLIANT, an individual and a corporation might publish at Kansas City on the same day the identical libelous article, and the one would have to be sued in Jackson county, or in the county of the plaintiff's residence if the defendant can be found there, whilst

the other could be dragged to the uttermost county of the State. Not only this, but this same law as thus construed says to the plaintiff in the one suit you shall have only a limited right as to choice of the forum, but in the other you shall have an unlimited right of choice. To one plaintiff (the one suing the individual publisher) this law, thus construed, says only two courts are open to you, i. e., the court of the county where the defendant resides, or by chance the court of your own county, if perchance you can find the defendant there, whilst to the other plaintiff (the one suing the corporation publisher) it says every court in this State is open to you. And this in the name of the constitutional guaranty aforesaid, and this, too, where the two plaintiffs, to whom is thus administered "the equal protection of the laws," are individuals. Can it be said that a constitutional law can thus discriminate between two individual plaintiffs? We think not. The law thus construed not only discriminates between publishers of libel, who are defendants, but it discriminates between individual plaintiffs who sue to recover damages for defamation of character. This law thus construed heaps coals of fire upon the back of a portion of our libel publishers, and strips the clothes from the back of a portion of the plaintiffs in libel suits. It tramples under foot not only the rights of the corporation defendant, but alike the rights of certain individual plaintiffs. And this in the name of the equal protection of the laws.

The Supreme Court of the United States in a case in which the enjoyment of the equal protection of the law was the direct issue, used the following reasoning, equally applicable to due process: "They [meaning the words of the Fourteenth Amendment] have reference to the actions of the political body denominated a State, by whatever instruments or in whatever modes that action may be taken. A State acts by its legislative, its executive, or its judicial authorities. It can

act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the law, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State." [Ex parte Virginia, 100 U. S. 1. c. 346.]

In Barbier v. Connolly, 113 U. S. 1. c. 31, the Supreme Court of the United States said: "The Fourteenth Amendment, in declaring that no State 'shall deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary deprivation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to  .  .  .  have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts."

This statute must be given the construction suggested in our paragraph one, or if given the construction announced in the opinion of my brother, then it must be declared violative of the Federal Constitution, and in either event the court, *nisi*, had no jurisdiction.

Not only so, but section 10, article 2, of our Bill of Rights (Mo. Const. 1875) reads: "The courts of justice shall be open to every person, and certain remedy afforded for every injury to person, property or

character, and that right and justice should be administered without sale, denial or delay.''

In discussing a similar constitutional provision, the Supreme Court of Wisconsin, in the case of Durkee v. City of Janesville, 28 Wis. 1. c. 471, says: ''It is obvious there can be no certain remedy in the laws, where the Legislature may prescribe one rule for one suitor or class of suitors in the courts, and another for all others under like circumstances, or may discriminate between parties to the same suit, giving one most unjust pecuniary advantage over the other. Parties thus discriminated against would not obtain justice freely, and without being obliged to purchase it. To the extent of such discrimination they would be obliged to buy justice and pay for it, thus making it a matter of purchase to those who could afford to pay, contrary to the letter and spirit of this provision. Certainty of remedy implies uniformity of remedy and equality of rights and privileges in all things respecting it, which can only be obtained by general laws, equally binding upon every member of the community. The language denotes that there can be but one remedy for all similar cases, which must operate upon all persons or parties alike, and be equally free and favorable to all.''

Our learned brother VALLIANT, in Sams v. Railroad, 174 Mo. 1. c. 69, said: ''Where there are two concerns engaged in precisely the same business, and both conducting it in precisely the same manner, a statute which would undertake to impose a liability on the one and not on the other, could not be sustained in the face of either our State or our Federal Constitution.''

We think this announces the correct doctrine, but it does not comport with the views expressed in the opinion now in hand. Here we have two concerns publishing a newspaper (one individual, the other corporate), and by the construction given to this statute, we make fish of the one and fowl of the other. Here we

have individual plaintiffs, who may be entitled to damages for defamation of character; to a portion of them we open the doors of every circuit court of the State, to the other portion only two of such courts are open. And yet are we to say that this construction of the statute leaves a valid statute? We think not.

If the law applied to all publishers of libels and to all suitors in libel suits, alike, there would be no question, but it does not. It gives to one portion of a class advantages not given to the other portion. It heaps disadvantage and inconveniences upon one portion of another class, which are not placed upon the remaining portion. That some advantages are given to suitors against a corporate libeler, over suitors against an individual libeler, could not be shown more strongly than by this case. Upon what theory would the plaintiff have left his home and friends in Jackson county, except upon the theory that by his construction of this statute he could acquire some advantage, or the defendant be placed at some disadvantage in another forum?

The whole trouble with our learned brother's opinion is, that it loses sight of the fact that we are dealing with two classes of persons, i. e., libelers or publishers of libels on the one side, and plaintiffs in libel suits on the other. By the opinion these natural classes are split in twain, and one law applied to one portion and another law to the other portion. This can not be done. In State v. Julow, 129 Mo. l. c. 177, by unanimous opinion of Division Two of this court, it is said: "The Legislature may legislate in regard to a class of persons, but they cannot take what may be termed a natural class of persons, split that class in two, and then arbitrarily designate the dissevered fractions of the original unit as two classes, and enact different rules for the government of each. This would be mere arbitrary classification without any basis of reason on which to rest, and would resemble a classification of

men by the color of their hair or other individual peculiarities, something not competent for the Legislature to do. [State ex rel. v. Herrmann, 75 Mo. loc. cit. 353.]"

We, therefore, think that, if the statute bears the construction given in the opinion, it not only violates the Federal Constitution, but the State Constitution as well.

III.   Nor will it do to pass over a question of this moment, i. e., a question involving the right to the equal protection of the laws, by saying of said section 997, as was said in the opinion filed in Division, "it is a clause in the defendant's charter, it is a part of the contract between the State and the corporation." This section, it is true, is found in a chapter of the statute upon corporations, but it relates purely and simply to procedure in the courts. It properly belongs in the Code of Civil Procedure. For the sake of the argument grant it to be true that the substantive and valid laws of the State pertaining to corporations are, and become, parcels and parts of the corporate charter, and thereby parts and parcels of the contract between the State and the corporation, can it be said that statutes pertaining merely to Civil Procedure, or invalid laws, are parts of such contract with the State? We think not. The title of the article is: "Organization, General Powers, Duties and Liabilities, With Incidental Matters of Practice." Thus the title itself denominates these sections, and there are a number of them, as mere "incidental matters of practice," and all of them are purely matters of procedure and not of substantive law.

If statutory enactments pertaining to remedies and methods of procedure are in fact parts of the contract with the State, when incorporation takes place, then by what right can the State violate this contract by providing different remedies and different methods of procedure? We have continously made changes of this character in both civil and criminal procedure, and yet

we say no vested rights are violated. Formerly the man charged with murder had forty-eight hours within which to challenge the trial jury, and later it was cut down to twenty-four hours, yet in this mere matter of procedure, we said no vested rights were disturbed, even though at the commission of the crime he was entitled to forty-eight hours, but at the trial, by virtue of the changed statute, he was only entitled to twenty-four hours. But charter rights and contract rights are of a different nature. When granted they are vested rights and cannot be ruthlessly swept away by one party to the grant. So that we say that mere matters of practice and procedure are in no sense charter or contract rights or in any way parts of the charter.

But even if they were, the State can no more make a contract violative of the Federal Constitution, than it can pass a law violative thereof. That which is violative of the Federal Constitution can no more be placed by the State in a contract or charter, than it could be enacted into law. If the law which is claimed to be a part of the contract or charter is an invalid law because violative of the Federal Constitution, it is no law, and hence no part of the charter or contract with the State. Out of naught, nothing comes.

IV. Further, we have been unable to reconcile our views with those of our distinguished brother, when he says that the words, "Julian is remembered here as a member of the Legislature, who did well in a legislative way," are ambiguous or double in meaning. To our mind these are clearly words of praise for this man as a legislator, and not words of censure. To our mind they are clear and plain in meaning, so much so that the trial court should have declared the meaning thereof as a matter of law. The adverb "well" as defined by Webster, means "in a good or proper manner, justly, rightly, not ill or wickedly." If these words stood alone the question would not be

a debatable one.    But it is said they take color from what follows.    The whole expression reads thus: ''Julian is remembered here (meaning Jefferson City, where the published article was written) as a member of the Legislature, who did well in a legislative way, but also as Stone's Chief of Police, of whom a Democratic Senate Committee said:    'He is not a proper man for the position.'    A Democratic Senate removed him and the Commissioners who appointed him.''    To our mind, when we supply the ellipsis and put in the proper omitted words, the language would be: ''Julian is remembered here as a member of the Legislature, who did well in a legislative way, but (he is) also (remembered here) as Stone's Chief of Police,'' etc.    Thus used it is evident to our mind there was a change from praise to blame.    That the language indicates praiseworthy service as a legislator, but charges total unfitness for the position of Chief of Police.

The trial court should not have submitted the words first-above quoted to the jury for their construction, nor should it have admitted evidence as to how they were understood.    The first clause is unambiguous and are clearly words of praise and not of defamation; the latter portion is likewise unambiguous, but are clearly words of censure or blame.

Again, to our mind the word ''well'' applies with equal propriety to the work of the professional man or legislator as to the business man.    Likewise as to the result of their work.    If we say of our learned brother that he *did well* in the preparation of his opinion, have we violated the proprieties in the use of language? We think not.    But to our mind the opinion has given to this language an exceedingly strained construction, and upon that point our brother did not do quite so *well* as in other portions of the opinion.

The word ''well,'' as seen from the definition above quoted, is not one borrowed from a commercial dic-

tionary, as we understand our learned brother to argue, but it is much more applicable to persons in other walks of life, and to things and persons other than those things and persons connected with the trades. Of the sick, we may say, "She is doing well." Of the pastor, we may say, "He has done well." Of a judge, we might say, "He did well whilst a member of the court." And so in a hundred ways to a number of things, professions and callings, this word is ordinarily used without violating the proprieties of the mother tongue. The true rule in the construction of words is that they should be taken in their fair English sense. Not in their mildest sense, for the purpose of obviating liability for the use thereof, nor in a strained sense or meaning for the purpose of fixing liability. As said in Ukman v. Daily Record Co., 189 Mo. l. c. 394: "The correct rule in construing words seems to be that they are to be taken not *in mitiori sensu*, but in their fair English meaning."

So is the opinion of ELLISON, J., in Wagner v. Printing Co., 45 Mo. App. l. c. 12: "We agree with counsel that, in construing the words employed in a libelous publication, the language should be given its natural and ordinary signification. But in cases of this nature, where the words charged are connected with other facts, such facts must be considered with the charge and the natural and ordinary signification given to the whole matter thus connected. If, thus considered, a libel is not charged, the case fails; on the other hand, if a libel is charged, the case stands and must be met by the defendant."

Again, this court, in McGinnis v. Geo. Knapp & Co., 109 Mo. l. c. 140, said: "The author already quoted on this subject says: 'For the purpose of its construction, language is to be regarded not merely in reference to the words employed, but according to the sense or meaning, which, all the circumstances of its

publication considered, the language may be fairly presumed to have conveyed to those to whom it was published.    The language is always to be regarded with reference to what has been its effect, actual or presumed, and the sense is to be arrived at with the help of the cause and occasion of its publication.  · The court or the jury is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language in question according to its natural and popular construction.'    [Townshend on Slander & Libel, sec. 133.]    The construction, which it behooves a court of justice to put on a publication which is alleged to be libelous, is to be derived as well from the expression used, as from the whole scope and apparent object of the writer.    [Spencer v. Southwick, 11 Johns. 592; Mason v. Stratton, 17 N. Y. St. Rep. 302.]    'Words are now construed by courts as they always ought to have been, in the plain and popular sense in which the rest of the world naturally understand them.'    [Roberts v. Camden, 9 East 93.]    'It is quite clear, from all the modern authorities, that the court must read these words in the sense in which ordinary persons, or in which we ourselves,   out   of court, reading this   paragraph,   would   understand them.'    [TENTERDEN, C. J., in Harvey v. French, 1 Cr. & M. 11.]    We cannot pervert the words and alter the ordinary construction of them.    [Bynion v. Trotter, Style 231.]    The words must be understood by the court in the same sense in which the rest of mankind would understand them.    [Woolnoth v. Meadows, 5 East 463.]''

This was a case where the trial court had sustained a demurrer to plaintiff's petition, and the court in the opinion, l. c. 150, further said: ''In other words, the court will not make any strained inferences in favor of those who thoughtlessly or else maliciously

touch with flippant lightness upon so sacred a thing as private character."

To this we desire to add, nor should courts give any strained constructions or make any strained inferences in favor of plaintiffs in actions of this character. The words must be given their usual and ordinary meaning, or such meaning as may be by the court or jury found from the words themselves and the circumstances attending their publication. The construction given by our brother does violence to the rule.

V. But grant it that the words "did well in a legislative way," are ambiguous and susceptible of a double meaning, in the connection, and under the circumstances and surroundings in which they are used, yet it cannot be held, under the great weight of authority, that plaintiff in a libel suit can put on readers of the article, to testify as to how they understood the words when they read them. To our minds there is and should be a clearly marked line of distinction between libel and slander cases in this regard. We can see reason for the rule in the case of slander or spoken words. Accompanying accent, intonation, facial expression, tone, manner, gesture, etc., are seen and heard by the witness. These things are difficult of description before a jury, so that it is practically impossible to place the jury in the place of the hearer. *Ex necessitate,* the understanding of the hearer becomes essential in the administration of justice, and his bald conclusion of the meaning of the language used is admitted. But how different when the language is put in cold print. There we have no intonation of voice, no expression of face, no shrug of shoulder or other gesture, no accent. In fact nothing to give the words other than their ordinary meaning, save and except the conditions and circumstances surrounding their publication. These conditions, circumstances

and surroundings are matters of easy and direct proof, and the rule *ex necessitate* finds no place in the case. When the jury have read or heard read the language, and when they, by other evidence, have been given the facts as to the conditions, circumstances and surroundings of the publication, then the jury are in as good or better position than a reader of the article and are just as competent to draw the conclusion as to what was meant by the language, as are the readers of the article.    The jury has before it everything that the reader could have had.    To permit a reader as a witness, to give his conclusions as to the meaning of the words under these circumstances, is to permit the witness to draw the very conclusion of fact, for which the jury has been selected to find and determine. Such a course permits the witness to usurp the place and province of the jury.    One of the ultimate facts to be found by the jury in this case was, in what sense was the language used?    It was the sole province of the jury to determine from the article itself, when taken with the other evidence, and under proper *innuendoes*, this question of fact.    Even experts are not permitted to give their conclusions and thus trespass upon this peculiar right of the jury.    [Roscoe v. Railroad, 202 Mo. 576, and cases therein cited.]

In reviewing the authorities, both cases and textbooks, we find, to our mind, an indiscriminate intermingling of doctrines which properly apply to certain slander cases, and which should not be applied to libel cases.    And we repeat that the great weight of authority in libel cases is contrary to the view expressed by Judge VALLIANT.    We must bear in mind that there is a difference between the two classes of cases.    In the one, slander cases, where the words are spoken, intonation of voice, accent, gesture, and other things, difficult and practically impossible to accurately describe to the jury, the opinion of non-expert witnesses, who

were hearers of said words, may be taken as to their meaning.    But this rule should not apply to slander cases, where the words are unambiguous, and not accompanied by the things aforesaid which are difficult to describe or reproduce before the jury, nor to libel cases.

Under the head of Opinion Evidence from Non-Professional Witnesses, Rogers, in his work on Expert Testimony (2 Ed.), sec. 3, page 6, says:

"The rule admitting the testimony of experts is exceptional for no principle of the law is better settled than that the opinions of witnesses are, in general, inadmissible in evidence.    They must state facts and not opinions deduced from the facts; for it is the peculiar province of the jury to determine upon the inferences which are to be drawn from the facts. But to this general rule there are well-recognized exceptions.    Experience has demonstrated the difficulty which exists in certain cases, of stating the facts in detail to the jury in such a manner that they shall produce the same impression upon the minds of the jurymen that they have legitimately produced upon the minds of the witnesses.    So that from the very necessities of the case, it is sometimes found essential that the opinions of ordinary witnesses should be received, as otherwise it would be impossible to arrive at any accurate conclusion as to the facts involved. . . .    The court must decide whether the subject-matter to which the testimony relates is of such a nature as to warrant the introduction of opinion evidence from the non-professional witnesses.    In deciding that question, the court will be governed by the following principles:

"(a)    It is competent for a witness to state his opinion in evidence when the primary facts upon which it is founded are of such a nature that they cannot be adequately reproduced or described to the jury,

so as to enable another than the actual observer to form an intelligent conclusion from them.

"(b)    And when the facts upon which the witness is to express his opinion are of such a nature that men in general are capable of comprehending and understanding them.    If they are not of that nature the opinions of ordinary witnesses could not be received, but the opinions would have to come from men of science or skill."

Upon the principle here announced, there are many slander cases in which it is held that the hearers or witnesses may say how they understood the language, and properly so, and there are other cases where the courts seemed to have overlooked the reason for admitting the testimony, and in these we find announced the broad doctrine that readers and hearers may testify as to their understanding of the language.

The same author (Rogers), in section 5 of his work, says:    "We have seen that opinions may be received when the facts cannot be made palpable to the jurors so that their means of forming opinions are practically equal to those of the witnesses.    It is equally true that opinions cannot be received in cases where the jury are equally capable with the witness of forming an opinion from the facts stated."

This is peculiarly applicable to the case at bar and to libel cases in general.    For in what way were these witnesses better prepared to draw and state a conclusion of fact than were the jury?    In what way were they better prepared to judge as to how such language *would be understood* by the readers of the Star, than was the jury?    The only charge in plaintiff's petition on this question is, "meaning thereby and intending to mean, *and that the readers of said newspaper would understand it to mean,* that plaintiff," etc., so that the only questions for determination were (1) the mean-

ing of the language, (2) what defendant intended to mean by it, and (3) what the readers *would understand* (not did understand) it to mean.      This is the full breadth of the pleading as to the question of fact to be determined, and when the jury had seen the editorial, as they did, and were informed about the condition of the public mind as to "boodling" at Jefferson City, as they were, by limited bits of evidence in the record, they had as much before them and more than did these non-experts, whose opinions were taken.

But to get back to the American rule in libel suits, in this class of evidence.      Newell, in his book on Slander and Libel (2 Ed.), section 33, page 308, says: "In actions for defamation witnesses cannot be allowed to testify as to the meaning which they understood the alleged defamatory matter to convey or to the particular person to whom they understood it to apply. A witness may testify to the publishing of the defamatory matter, the speaking of slanderous words or publication of a libel, together with all the attendant circumstances and connections, the existing facts; and after having done so, it is for the jury to determine from the evidence who was meant and what was meant."

In section 34 he illustrates by quotation from a number of leading American cases, mostly libel cases. In section 35 he discusses cases which do not support his text as announced in section 33, which cases are from the English courts and some from the American courts.      Our brother quotes from the first of this section 35, wherein it is said that there is some conflict between the text announced in section 33 and some few cases, and to what he has quoted from section 35 we wish to add the conclusions and reasons of the author, as found in the last paragraph of said section 35, page 313, which reads thus:

"Upon the theory that circumstances never conspire to commit perjury, and that witnesses may and sometimes do, it is probably in this class of cases—dangerous at best, and where the witnesses are frequently partisans of the plaintiff or defendant, the temptation to commit perjury great and the danger of detection extremely remote—for who can tell the impressions upon the minds of others or their secret thoughts—the safer rule to allow the witnesses to testify to the publishing of the defamatory matter, together with all the surrounding circumstances and existing facts, and after having done so, let the jury determine from the evidence who was meant and what was meant."

In an able opinion by Dickson, J., 37 Minn. l. c. 278, 279 and 280, the question is thus discussed in the libel case of Gribble v. Pioneer-Press Co.:

"The alleged libel upon which this action is brought will be found in the reporter's statement of the case.    Upon the trial of the case, the court permitted several witnesses to testify that they, at the time of the publication, understood the article as using the term 'shyster' as applicable to the plaintiff. Upon subsequent consideration, the learned judge who tried the cause having come to the conclusion that such evidence was inadmissible, a new trial was for that reason granted, and upon the same question the case is before us for review.

"We are of the opinion that the learned judge was right in his conclusion that the evidence was not admissible.    [Van Vechten v. Hopkins, 5 Johns. 211 (4 Am. Dec. 339); Gibson v. Williams, 4 Wend. 320; Wright v. Paige, 3 Keyes 581, 583, 584; Snell v. Snow, 13 Metc. 278 (46 Am. Dec. 730); White v. Sayward, 33 Me. 322; Rangler v. Hummel, 37 Pa. St. 130; McCue v. Ferguson, 73 Pa. St. 333; Daines v. Hartley, 3 Exch. 200; and see opinion of Walworth, Ch., in Maynard v. Beardsley, 7 Wend. 560 (22 Am. Dec. 595).

"This is in accordance with the principle of the law of evidence which in general limits the testimony of witnesses to a statement of the facts and circumstances within their knowledge, to the exclusion of their opinions and mental conclusions concerning the very matter in issue. The exceptional grounds upon which such evidence was deemed admissible in Blakeman v. Blakeman, 31 Minn. 396 (18 N. W. 103), in an action for slander, and in some other cases, is a recognition of the applicability to such cases in general of the ordinary rule of evidence. No such exceptional reasons, no necessity, existed in this case for the resort to such testimony to inform the jury as to whether this printed publication was intended to apply the term 'shyster' to this plaintiff, and the reasons which in general forbid a resort to such evidence were applicable here. The question to be determined by the jury was, not what interpretation these witnesses had put upon the article when they read it, but what was its meaning? This the jury could determine directly from a reading of the article itself, and by the aid of such other facts and circumstances as might affect the question. Whatever relevant facts, outside of the publication, could have enabled these witnesses to form an intelligent opinion or understanding that the offensive term was intended to be applied to the plaintiff, could have been placed before the jury, and the question in issue should have been determined by the jury from the established facts relevant to the issue, and not from the opinions or understanding of witnesses, which may have been based upon very insufficient reasons. It would be a dangerous practice, not in general to be resorted to, to apply in a court of justice, for the interpretation of the conduct or of the language of men, the understanding, conclusions, opinions of others, which are too often formed under circumstances not conducive to an impartial, mature, and

correct judgment.   That would be, in some degree, and  in some sense, to substitute the  irresponsible, hasty opinions of perhaps prejudiced minds for the calm, deliberate judgment of juries, acting under the sanctions and with the aids which attend their deliberations.   In the language of SHAW, C. J., in a similar case (Snell v. Snow, supra.), to resort to such evidence 'would be to make the defendant's liability depend, not on his own malicious intent and purpose in using the language, which might be quite innocent and free from blame, but upon the misconceptions or morbid imagination of the person in whose hearing they were spoken.'

"There were no peculiar circumstances, either as respects the language employed, or the manner of its utterance or publication, to justify a departure from the ordinary rules of evidence.   The effect of the testimony was simply to present to the jury the opinions of these witnesses as to the meaning of the libel, and that it was intended to apply to the plaintiff the offensive term used in the article.   It cannot be said that this testimony was harmless, and cannot have affected the result, unless it is to be also declared that the libelous article bears upon its face, and by necessary legal construction, the meaning and application which is given to it in this testimony.   This we cannot declare.   We deem that to be a question proper for the consideration of a jury, not necessarily to . be determined from the article alone, but from it in connection with such circumstances as may be relevant to the question."

The case referred to in the opinion in 31 Minn. as an exception to the rule, is one where foreign language and idioms of speech were used accompanied by gestures.

The Pennsylvania Court in Railroad v. McCurdy, 114 Pa. St. 1. c. 559, speaks thus:  "It is not compe-

tent in an action of libel to aid the *innuendo* by the mere opinion of a witness. 'If this could be done,' says Mr. Justice THOMPSON, in Rangler v. Hummell, 1 Wright 130, 'there would be no use for an *innuendo;* its office would be supplied by the oath of the witness, who would draw the inference from the precedent facts, instead of a jury; this is not permissible.' "

In a case from New York, Beardsley v. Maynard, 4 Wend. l. c. 359, where the defendant had offered a witness to show how he understood the libellous article, which offer was excluded *nisi,* the court said: "The case of Van Vechten v. Hopkins (5 Johns. 211), is an authority too clear and explicit on this point to permit a doubt to be entertained. In that case, the plaintiff offered to prove by a witness that from reading the libel he applied it to the plaintiff; this proof was excluded by the judge at *nisi prius,* and his decision unanimously confirmed by this court. The reason assigned for excluding this testimony was, that it was the mere opinion of a witness, which the court said ought not to have any influence upon the verdict. Opinions are not proofs, and if they are ever received it is in cases involving peculiar or professional skill, and then they are usually accompanied with the facts or reasons on which they are based. It was the duty of the jury to say how the libel was to be understood, after they had heard all the extrinsic facts that the parties chose to submit to them; and in coming to this conclusion it is not proper that they should have been influenced by the mere opinion of any witness. The asking of a witness to apply the libel, as was done in the case of Van Vechten v. Hopkins, or to tell how he understood it, as was done in this case, appears to me to be much the same thing; and if the testimony offered in the one case was properly rejected, that offered in the other could not be received."

In the case of Rangler v. Hummell, 37 Pa. St. l. c.

134, the court, after criticising Mr. Starkie, relied upon by Judge VALLIANT in his opinion, says: "The rule of law is too well settled to permit a doubt upon it, that it is the business of witnesses to state facts, and the province of the jury to draw such inferences or conclusions from them as they shall conscientiously believe to be warranted. This rule was violated in the reception of the opinion of the witness, and for that reason only the case must be reversed."

The doctrine announced by Starkie is again criticised by the Supreme Court of Maine, in White v. Sayward, 33 Me. l. c. 326, wherein the court says: "The plaintiff introduced witnesses, though objected to, who testified that they understood that he was referred to in the article published on May 8, 1849. According to 2 Starkie, 861, this evidence was competent. It is there stated in the text, 'the colloquium and other averments which connect the words or libel with the plaintiff or subject-matter before stated must be proved. This is usually done by the testimony of one or more witnesses, who knew the parties and circumstances, and who state their opinion and judgment as to the intention of the defendant to apply his words or libel to parties or circumstances as alleged.' Mr. Greenleaf's treatise, 2d vol., sec. 417, contains the statement of a similar doctrine. It is very clear that the rule laid down by the two learned authors referred to is an exception to the great principle which is generally applicable to evidence. Witnesses are confined to the statement of facts and circumstances, leaving the inference and conclusions to be drawn by the jury. It is an elementary doctrine in the law of evidence that the understanding and opinions of witnesses are not to be received except in matters of science and a few other special cases resting upon peculiar circumstances."

The Colorado court, Republican Pub. Co. v. Miner, 12 Colo. l. c. 85, says: "Against the objection of

appellant, the court permitted witnesses for appellee to testify as to their understanding of what was charged by the said matter so published June 21st; their testimony being that they understood that the offense of attempt to murder by poisoning was charged thereby. I think this evidence was improperly admitted, and that the evidence so admitted was prejudicial to appellant. By section 10, article 2, of our Constitution it is provided that in cases of this kind, under the direction of the court, the jury shall determine the law and the fact."

In Snell v. Snow, 54 Mass. l. c. 282, it is said: "The other exception of the plaintiff is also, in the opinion of the court, untenable. The witness, after stating all that defendant said, with all the attendant circumstances and connections, was asked what meaning he understood the defendant to convey by these words. The judge very properly decided that the witness might testify to any existing facts or circumstances, to which the defendant alluded and referred, if any; but, having given the whole conversation, it was for the jury to determine what was meant by the language used, and that it was not competent for the witness to testify to his understanding of the defendant's meaning, in the language used. If the words, in their ordinary sense, according to the rules of language, imputed a charge of unchasteness and crime, or if, taken in their connection with other facts or words, they would bear that meaning, we are to presume that the jury would so find. If in their natural import, or with accompanying words and facts, they would not bear that meaning, the witness's understanding of them could not legitimately govern or aid the jury, and would therefore be incompetent. It would be to make the defendant's liability depend, not on his own malicious intent and purpose, in using the language, which might be quite innocent and free from blame, but upon

the misconception or morbid imagination of the person in whose hearing they were spoken.''

In Iowa, case of Anderson v. Hart, 68 Iowa l. c. 402, the doctrine is thus stated: ''When a libellous communication on its face directly, or by way of *innuendo* or otherwise, refers to any person, it is possibly true that a witness may be asked who or what person was meant. Subject to this rule, the decided weight of authority, we think, is that the alleged libel must be construed by the court and jury.''

Ross, J., for the Supreme Court of California in People v. McDowell, 71 Cal. l. c. 194, says: ''The court below erred in permitting the witness Andrew J. Clunie to be asked and to answer the question: 'Please look at page 6 of this paper and state to whom the article contained upon that page under the heading ''Sharks and Humans'' (being the article alleged to be libellous) has reference.' It was for the jury to say to whom the article referred.''

So again, the same court, in the celebrated case of Hearne v. DeYoung, 119 Cal. l. c. 677, wherein the plaintiff was formerly a Missourian, and was by defendant's paper charged (as alleged by plaintiff) with the murder of one Stilwell at Hannibal, Missouri, announces the rule thus: · ''It is claimed that the court committed error in allowing witnesses who had read the publication charged as libelous to testify as to their understanding of its meaning. Those witnesses testified their understanding of the article, after reading it, was to the effect that it charged the plaintiff as a *particeps criminis* in the murder of Stilwell. This character of evidence was not admissible in the case at bar. Tested by the record, the witnesses for plaintiff to this proposition stood exactly as the jurors. They were in no sense learned and scientific men. They knew nothing of the parties or the circumstances, save what they gathered from the publication. Their

conclusions were based alone upon a reading of the
article, and under such conditions the jurors were as
competent to arrive at a correct conclusion as to the
meaning of the publication as were these witnesses.
In such a case, the law does not allow the judgment
of a witness to be substituted for the judgment of the
juror."

In Hacker v. Heiney, 111 Wis. 1. c. 317, the court
said: "Error is assigned upon the admission of cer-
tain testimony of the witness Robert Hacker, as fol-
lows: He had described an occasion when defendant's
husband went down to Otto Hacker's (plaintiff's hus-
band's) house for rubber boots, and on his return was
greeted by defendant with the words, 'You have been
out whoring again.' Witness was then asked, 'Whom
did you understand she referred to?' and answered,
over objection and exception, 'Why, it was Bertha
[plaintiff], because he went down to that place after
the boots.' It is undoubtedly erroneous to permit a
witness to testify to his understanding of the words
charged as slander. [Townshend, Slander & L., par.
375a; Kidd v. Fleek, 47 Wis. 443.]"

A number of other cases cited in appellant's orig-
inal brief are in point, but further excerpts would be
useless.

Judge VALLIANT says that the precise point has
not been passed upon by this court, and argues that it
was not so passed upon in Callahan v. Ingram, 122 Mo.
1. c. 375. In that case a witness was offered for the
purpose of showing his understanding of the language
used, and upon this point, MACFARLANE, J., said:
"There was no error in refusing to permit witness
Lane to testify as to his understanding of the slan-
derous words used by defendant. A witness may tes-
tify as to the speaking of the slanderous words 'to-
gether with all the attendant circumstances and con-
nections, the existing facts; and, after having done

so, it is for the jury to determine from the evidence . . . what was meant.' [Newell on Defamation, Slander and Libel, page 308, and cases cited in note.]"

It will be observed that the court does approve of section 33, page 308, of Newell on Slander and Libel, with the cases thereunder cited. This is the section which we have set out in full hereinabove, and which holds the evidence to be inadmissible. We have also quoted from some of the cases cited by the author, which cases this court evidently approved in the Callahan case.

There are cases of slander in this State where the courts have admitted such testimony, but we know of but one case where the doctrine has been announced in a libel case, and that is Wagner v. Printing Company, 45 Mo. App. l. c. 13.

The case of Caruth v. Richeson, 96 Mo. 190, does not go to that extent. The question there was whether or not the libellous article applied to the plaintiff, he not being specifically named. It may be that we can and should go this far, and permit witnesses to testify as to whom they understood the article to apply, but this is certainly the limit, as said in Anderson v. Hart, supra, the Iowa case quoted. In the Caruth case, they only attempted to prove it by the defendants themselves. The defendants were placed upon the stand and were asked to whom they referred in the libellous article, or report as it was, in that case. Even that is quite a different question from that of putting on a rank outsider, as a witness, and asking him to whom he understood the article to apply. The able and distinguished attorneys representing Caruth were evidently impressed with the rule for which we contend, for otherwise they would not have resorted to the extreme and dangerous act of putting upon the witness stand the defendants to make out plaintiff's case. No doubt plaintiff had numerous friends who would have testi-

fied that they understood the article, to apply to plaintiff.

Such testimony could be admitted only upon one of the two theories, (1) that the witness was better qualified by learning to-express opinion upon the language, and thus testify as an expert, or (2) that he possessed knowledge of peculiar facts existing at the time of the utterance which gave it peculiar significance. If admitted upon the first theory, then it follows that it would be allowable to place a witness upon the stand, detail to him what the circumstances of publication were, as shown by the evidence, and then ask him to read the article, and give to the jury his opinion as to the meaning. That this is not the law, we take it, stands conceded. Up to this date no such case appears in the books. Nor is it proper upon the second theory. In such case the jury is entitled to know the facts upon which the opinion is based, so as to determine for itself whether the opinion expressed is well founded, and further, if the facts within the peculiar knowledge of the witness are such as can be detailed, then the jury are as competent to form the conclusion as is the witness.

If it is a new question in this court, as my learned brother concedes, then we should move with care. Here we have a jury before whom has been given all the evidence of surrounding conditions and circumstances, and are therefore better prepared to draw a conclusion as to the meaning of the words than any mere reader. Why then should the reader, as a witness, be permitted to usurp the province of the jury, and draw the conclusion as to the ultimate facts to be found? We have no hesitancy in saying that in cases of this kind, i. e., libel cases, the only thing the witnesses can do is to testify to the facts as to conditions and surroundings, and then it is a question solely for the jury to determine as to what meaning is to be or

can be attributed to the published language.   Thus is the great weight of authority upon the question, and this court should so announce.  The admission of this evidence was error.

VI.    Among other things assigned as error by appellant is the exclusion by the court of the testimony of plaintiff, Julian, and Frank M. Lowe, taken before a committee appointed by the Senate of the State of Missouri for the purpose of investigating charges of improper conduct upon the part of the Police Department of Kansas City at the time the plaintiff was Chief of Police.   The plaintiff, for the purpose of showing malice, had introduced an editorial appearing in the Kansas City Star, February 6, 1897, which article was headed, "Two Different Stories." This article had for its basis the respective statements made by Julian and Lowe as witnesses before the committee.   Julian was Chief of Police, and Lowe, Prosecuting Attorney.   Both had to deal with violators of the law.   Lowe had testified that shortly after Julian was appointed Chief of Police, he met Julian and they had talked as follows:

"The conversation I had with him was within a few days after his appointment, possibly in two or three days.   I am not positive about that.   I had just come out of the New York Life Building.   It was in the evening, almost dark.   Just as I came out of the entrance, I met Mr. Julian, possibly twenty feet from the entrance.   I said, 'Hello, Henry.'   He says, 'Hello, Frank.'   I congratulated him upon his appointment. He said to me, 'I want to see you.'   He says, 'We have the two best offices in the county; the thing for us to do is to agree on a policy and work together.'   He said that all this talk about running anybody out of town was all rot.   What we ought to do was to have our policy and work together, 'and fix ourselves.'   He said to me that was a matter that ought to be kept between

us, and nothing said about it.    I says to him:  'Henry, you run your office, and I'll run mine.'"

Julian had testified, explaining the conversation testified to by Lowe and denying that he had used the words, 'fix ourselves' in the conversation.    On page 533 of the record, the defendant made this specific offer:

"Mr. WATSON:    We offer, then, specifically, to meet the article introduced by the plaintiff dated February 6th, 1897; we offer the testimony taken before the Senate investigating committee of Mr. Frank M. Lowe; we offer that to meet the allegations of the article of February 6th, read in evidence by the plaintiff in this case; and we offer also in connection with that the testimony of Mr. Julian before the Senate investigating committee."

When the editorial is read in connection with the testimony of these two witnesses, any  fair-thinking man will say that this editorial was legitimate, and was but a fair criticism of the plaintiff, on the facts before the publisher.    It could not be said that the article bore evidence of malice, when the basic facts are considered along with it.    The question is, Was it proper to show this testimony upon which the editorial was based, as tending to rebut malice?    We think so, and thus again differ from our brother.    The editorial is a comparison of these two sworn statements. The testimony was given and taken in a public trial or investigation, wherein were counsel.    It was taken by a stenographer, returned with the report of the committee, and is a public record in that proceeding.    To permit the editorial to be introduced to show malice, and then say to defendant you cannot show the circumstances which called for the editorial and its publication, to rebut the idea of malice, seems to us to be the height of unfairness.    The writer of the other

209 Sup—9

opinion excuses the action of the lower court on the
ground that such evidence is hearsay.    It is not hear-
say.    It is the primary evidence of what was in the
mind of the defendant or its agent at the time the edit-
orial was written and published.    It was what was
in the mind of the editor when the editorial was penned,
and it tended to show the absence of malice and that
the editorial was a fair criticism, by the editor, with
the lights he had before him.

But grant it that the testimony is purely hearsay,
yet the position of our brother is indefensible.    In
libel and slander suits the defendant can both justify
and plead in mitigation.    He can, for the purpose of
reducing the punitive damages, plead by way of mit-
igation that the writing was published in good faith
upon the information he had, and was published with-
out malice.    The absence of malice is at least a miti-
gating circumstance on the question of punitive dam-
ages and the plaintiff sued for and recovered both com-
pensatory and punitive damages.    Pleas in mitigation
may rest upon hearsay evidence, in fact what the writer
gets from others, and acts upon in good faith, are
the very things which tend to show good faith and ab-
sence of malice.    Had the defendant in this case been
sued upon the editorial entitled, ''Two Different Sto-
ries,'' there could have been pleaded by way of miti-
gating punitive damages, and to disprove malice the
very things by the trial court excluded.    This court has
expressly recognized what my   brother · denominates
hearsay evidence as proper in such cases. . In Jones
v. Murray, 167 Mo. l. c. 49, we said:    ''The fact that
a plea in mitigation may rest upon hearsay testimony,
that is, that some one told the defendant and he be-
lieved it and acted in good faith, emphasizes the im-
perative necessity for carefully instructing the jury
as to the nature, effect and extent of a plea in miti-
gation, for unless so instructed the untrained minds

of the laymen are likely to be confused and misled into accepting such mitigating circumstances as a complete defense, and so not only temper the defendant's punishment, but also in so doing deny compensation to the plaintiff for the wrongs he has suffered at the hands of the defendant.''

So also says the Kansas City Court of Appeals, per SMITH, P. J., in Lewis v. Humphries, 64 Mo. App. l. c. 473: ''Anything which tended to disprove malice was admissible in mitigation. The absence of malice may be shown by proving that defendant believed, and had some reason to believe, the charge to be true when made. This can be done by proving either that he received such information from others as induced him to believe the charge to be true, or by proving the existence of facts within his knowledge calculated to produce such belief. [Townshend on Slander, 676; Bush v. Prosser, 11 N. Y. 347; Hatfield v. Lasher, 81 N. Y. 249; Jones v. Townsend, 21 Fla. 431.]''

And again, this court, in Callahan v. Ingram, 122 Mo. l. c. 372, said: ''Exemplary damages may always be given in suits for slander when the words are maliciously spoken, but, whether such damages should be given, in any case, is a matter within the discretion of the jury. In order to show good faith, and want of malice, the defendant has the right to put in evidence all the circumstances under which the words were uttered, and if such circumstances tend to rebut malice, such damages could only be awarded in case the words were maliciously spoken, but may, in themselves, be sufficient proof, if malice is implied therefrom.''

Now if we can use such evidence upon a plea in mitigation, for the purpose of showing good faith and absence of malice, why is not the same character of evidence proper for the purpose of showing the same things with reference to a writing, which the plaintiff

has introduced for the express purpose of showing malice?

But after all, malice, like insanity, is but a condition of mind, and to prove or disprove this mental condition, you have the right to show any and all things, operating upon the mind at the time of the act in question. A review of our cases as to what is competent to be shown where the insanity of the actor is in question would be useless because they are too well known to Bench and Bar.

VII. Plaintiff's instruction numbered 5 reads as follows:

"It is admitted that the defendant published of and concerning the plaintiff the words sued on. If, therefore, the jury believe and find from the evidence that said words, taken all together and considered fairly with their context, and with other facts proven, were on their face libellous, as elsewhere defined in these instructions, then the jury will find for the plaintiff, even though they may not believe the words sued on are reasonably susceptible of the construction placed upon them by the plaintiff in the *innuendoes* of his petition."

The giving of this instruction was rank error for several reasons.

(a) The instruction is contradictory and misleading. It requires the jury to find that the words used "were on their face libellous," but in doing so the words must be "taken all together and considered fairly with their context, *and with other facts proven.*"

To find as this jury, by the instruction, was required to find, that the words "were on their face libellous," what right had the jury to consider "other facts proven?" When the jury was directed, whether properly or improperly, to find whether the words were libellous on their face, how could the jury employ outside aids? When we say that words are libellous

on their face, we mean that by a mere inspection of the words the fact of their libellous character becomes apparent, and we do not mean that we can take into consideration evidence of outside circumstances in order to determine whether or not they are libellous on their face.   If they are libellous on their face, evidence of outside facts would be improper.   Evidence of surroundings is only given to show a libellous character to words which are ambiguous or susceptible of more than one meaning.

But here we have a jury directed to determine the facts as to whether or not the words on their face, that is to say, within themselves, are libellous, yet telling them to resort to other evidence for the purpose of determining the fact, which evidence was introduced to show that the *innuendo* was true.   To say the least, this instruction is a curiosity, and its expressions certainly escaped the usual literary acumen of our distinguished brother when he placed his stamp of approval thereon.

(b)   The effect of this instruction was to permit plaintiff to abandon his *innuendoes* and fall back upon the words themselves.   There are cases where the *innuendoes* in the petition have been treated as surplusage, and the plaintiff permitted to have his case submitted to the jury on the words themselves.   [Hudson v. Garner, 22 Mo. 423; Callahan v. Ingram, 122 Mo. 355, and a number of cases of like effect cited in 25 Cyc. 452, in note to the text.]

The text fairly states the cases upon this point, as well as another to be presently discussed, and we quote it thus: "The *innuendo* may be treated as surplusage where it is used in connection with words which are unequivocal and actionable *per se,* and it is held that where plaintiff in an action has, by *innuendo,* put a meaning upon the alleged defamatory publication which is not supported by its language or by proof, the court

may nevertheless submit the case to the jury, if the publication is defamatory *per se*. But where the communication is not actionable *per se* and the *innuendo* is used to impute a defamatory meaning, plaintiff is bound by the construction which he has given to the words in the *innuendo*." No one will contend for a moment that the words "did well in a legislative way" are actionable *per se,* or are libellous *per se,* yet by this instruction, these words are submitted to the jury to determine whether they are libellous on their face, without the *innuendo* being submitted.

We concede that if the words "are unequivocal and actionable *per se,*" then the *innuendo* may be abandoned and treated as mere surplusage in the petition, and the words themselves submitted to the jury by a proper instruction, but not by an instruction like this, wherein they are directed to consider other facts in evidence, which in this case included proof of the *innuendo* abandoned and treated as surplusage. The authorities on this question are all one way.

(c) In the language of the text, "But where the communication is not actionable *per se* and the *innuendo* is used to impute a defamatory meaning, plaintiff is bound by the construction which he has given to the words in the *innuendo*."

In Patterson v. Frazer, 79 S. W. l. c. 1082, the Texas court says: "It is a settled rule of law that, whenever a specific meaning is given to the terms of a libel or oral slander by connecting it with previous matter, the whole must be proved, as being essential to the nature and identity of the charge."

To same effect is Johnston v. Morrison, 3 Arizona l. c. 113, where it is said: "If the words 'fine work,' as set forth in the complaint, are actionable *per se,* no construction of the language is needed. We do not think they are actionable *per se,* and, not being so,

plaintiff in his pleadings places his version of the langage, and he must be bound by it."

So also says the Supreme Court of Vermont, in 44 Vt. l. c. 355, in the case of Kimmis v. Stiles: "Where the party gives a definition of the words in the *innuendo*, he is bound by the definition given, even though he may thereby limit the meaning as expressed in the colloquium.    Here the meaning assigned to the words in the *innuendo* is: 'meaning that he, plaintiff, swore in said court falsely.'    A man may swear falsely, and yet be innocent of perjury, and although the same strictness is not required in a declaration as would be required in an indictment, yet the crime imputed should be so defined as to leave no reasonable doubt as to the intention."

Approving this doctrine are the cases of Mix v. Woodward, 12 Conn. 262; Merrill v. Marshall, 113 Ill. App. 447; Herrick v. Tribune Company, 108 Ill. App. 244; Hamilton v. Lowery, 33 Ind. App. 184; Brown v. Tribune Assn., 77 N. Y. Supp. 461; Ruel v. Tatnell, 43 L. T. Rep. (N. S.) 507.

So, that, we say, the words, 'did well in a legislative way,' were erroneously submitted to the jury in this instruction because such instruction does not require the jury to find that such words bear the meaning ascribed to them by plaintiff in the *innuendo*.

(d)    Nor, in our judgment, is the clause, "but also as Stone's Chief of Police, of whom a Democratic Senate committee said, 'He is not a proper man for the place.'    A Democratic Senate removed him and the commissioners who appointed him," actionable *per se*.    To our mind the sting to this charge is that Julian was not a competent man for Chief of Police, and for that reason he had been removed from office, and the Police Commissioners were likewise removed for appointing him to office.    This is at least one construction which could be given the

language, and this construction was fully justified by the proof, to the effect of the incompetency of Julian, if not further. To this language, clearly susceptible of several meanings, all of which of course are not in praise of plaintiff, he, the plaintiff, by *innuendo,* has placed a meaning thereon. The Senate under the law, which everybody, including readers of the Star, is presumed to know, could not remove plaintiff from office. The meaning ascribed to the words is fully set out by Judge VALLIANT. Whether he should be bound by this meaning, so placed, or not, is a question which we will not go into at this time, for the reason that the instruction puts the whole language, including "did well in a legislative way" before the jury, and not this last clause alone. In this there was evident error.

(e) By this instruction the plaintiff was permitted to abandon the whole theory upon which the case was pleaded and tried, which to say the least is questionable practice.

VIII. Nor do we think that there has been a waiver of the question of jurisdiction. The defendant entering its appearance for that purpose only, first filed a motion to dismiss, which was within itself a plea to the jurisdiction. It in effect challenged the jurisdiction of the circuit court of Platte county. Two days later with this plea to the jurisdiction pending, a plea upon which the defendant had a right to be heard, and in the event of an adverse ruling, a right to stand, it filed an application for a change of venue, alleging the prejudice of the judge of the Platte County Circuit Court. The defendant was entitled to have this issue tried before an unbiased judge, and his application for change of venue, before answer to the merits, and with this issue of jurisdiction which was raised by a special appearance, should not be construed as a general appearance and waiver of jurisdiction. On the contrary the time of the application shows that in-

stead of waiving the jurisdiction raised by this special plea, it was only trying to get a trial thereof before an unbiased judge. We must construe the change of venue law in a reasonable manner. To hold that an issue of jurisdiction can be raised by special plea, and that the defendant cannot avail himself of the right guaranteed him by the change of venue law, for a trial of the issue, before an unprejudiced judge, but waives his plea by the mere asking of a change of venue, is to take from the defendant the very right given him by the change of venue, i. e., the right to a trial of all issues in his case before an unbiased tribunal. This will not do. Immediately upon this motion being overruled, the defendant by answer raised the same question. So that from the very beginning and throughout the whole proceeding, this question appears in this record. There was no waiver of jurisdiction. [Meyer v. Insurance Co., 184 Mo. 481.]

To hold that there is a waiver under the facts in this case is to say to a defendant, notwithstanding the law guarantees to you the right to a fair and impartial trial on all the issues in your case before an unbiased court, if you, in order to secure an unbiased court, file the statutory application and affidavit for such change, you must waive an important and vital issue in your case.

The plaintiff relies chiefly upon the case of Baisley v. Baisley, 113 Mo. 544. This case is not authority here. The facts are totally different. There the suit originated in Chariton county. Defendant filed a plea to the jurisdiction, which was tried by the Chariton Circuit Court, and ruled adversely to the defendant. Defendant thereupon prepared and filed his bill of exceptions on said trial, but did not appeal from the judgment of said court. After all this had been done, he filed his application and affidavit for change of venue, and by agreement of the parties the venue was

changed to Carroll county. In Carroll county the defendant filed answer in which among other things he reiterated the plea to the jurisdiction, heard and decided against him in Chariton county. Now the difference between the two cases lies in this: in the Baisley case, at the time the application for change of venue was made, no special plea to the jurisdiction was pending, for it had been heard and determined, whilst in the case at bar the special plea to the jurisdiction was pending and undetermined, and was one of the issues for trial.

Concede that the filing of an answer, or the filing of an application for change of venue is a general appearance, when there is no special plea to the jurisdiction pending, and is a waiver, yet it cannot be so said when such plea is pending, and the purpose of the change of venue is to get an unbiased court to pass upon that issue. In the case of Harkness v. Hyde, 98 U. S. 476, it is said: "It is only where the defendant pleads to the merits in the first instance, without questioning the jurisdiction, that the objection is waived." Under the facts of this case there was no waiver of the question of jurisdiction.

IX.    When plaintiff was on the witness stand, the following and other similar questions were propounded to him:

"Q. Following the publication of this libel complained of in the petition of January 5th, 1903, I will ask you to tell the jury what resulted therefrom that affected the manner and way in which your acquaintances treated you?

"Mr. FIELD: We object to that as calling for the the conclusion of the witness, and as incompetent testimony."

The objections were overruled, and in response to such question, the plaintiff in substance said that a great many men whom he knew casually grew cold to-

wards him; that when he went into a crowd that pre-
viously received him as a social equal and cordially,
some men would get up and leave and then another;
that when he went to clubs to which he belonged and
to other places, he would see one man get up and
leave and then another would have business across the
room or would go out.

This testimony is incompetent and highly preju-
dicial.   It is too indefinite to be of value.   There is
nothing to show that these unnamed parties, who so
acted, even knew of the publication here sued upon, or
were induced thereby to so act.   If they did so act,
it might have been for other good and sufficient rea-
sons.   At least their acts should have been, by some
direct proof, coupled with this publication.

The precise question is passed upon by the St.
Louis Court of Appeals in Kersting v. White, 107 Mo.
App. 265.   At page 283, Judge BLAND, who wrote the
principal opinion, concurred in by Judge REYBURN,
said:   "It is a mere matter of conjecture that the
changed demeanor of the Buss family toward the plain-
tiff was attributable to the slander.   It might have
been from some other cause having no relation what-
ever to the slander and such testimony should not have
been admitted without some direct evidence that the
change of conduct was influenced by the publication of
the slander."

Judge GOODE, in a separate concurring opinion,
says:   "I agree that the testimony in regard to the
demeanor of the Buss family to the plaintiff was in-
competent and very prejudicial.   No showing was
made that any member of that family ever heard of
White's statements to Henry or that any one but Henry
ever heard of it.   To allow the jury to conjecture that
what White said to Henry caused the Buss family to al-
ter their behavior to the plaintiff, in view of the fact
that the rumors against her were so general that there

had been an investigation of their truth by a society of the community, was palpably erroneous and amounts to holding defendant responsible for conduct of other people which he may have had nothing to do with.    I can think of no rule by which that evidence was admissible.''

There is no presumption in the case at bar that these unnamed men, unnamed clubs and unnamed gatherings had read this article in question, or were influenced thereby.    This is a subject of direct proof.    But aside from that the very question propounded calls for a mere conclusion of the witness.    The objection should have been sustained and this evidence excluded.    Had it been shown that the individuals, clubs and associations had read the article, a    different    question might be presented, which we will not here discuss.

X.    The record is voluminous and many objections are urged throughout.    And in the hurry of a trial it would be a difficult matter for a trial court, however learned in the law, with able lawyers upon both sides hotly contesting each point,    and    vehemently pressing the admission or exclusion of evidence, and insisting upon this or that instruction, to keep error out of a record of this size.    As stated, one hundred and two assignments of error are lodged in this court, but the excessiveness of the verdict does not appear in the list.    There are several other acts upon the part of the trial court alleged to be error, and we think they are erroneous, but we have already written enough and these questions will be left untouched.    With the views we have, and for the reasons we have tried to express, we are    of    opinion that this case should be reversed and remanded with directions to the circuit court to sustain defendant's motion to dismiss the cause for want of jurisdiction.    But if this court holds that the court *nisi* had jurisdiction, there is no question that the errors in the course of the trial as above indi-

cated would at least demand the reversal and remanding of the cause. *Lamm, J.,* concurs in this opinion.